# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 99-1134

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Robert Turner, | * |
| | * |
| Appellant. | * |

_____　　　　　　　　Appeals from the United States
　　　　　　　　　　　　　　　　District Court for the
No. 99-1136　　　　　　　　　　Eastern District of Missouri.

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Guinn Kelly, | * |
| | * |
| Appellant. | * |

_____

Submitted: May 12, 1999
Filed: August 12, 1999

_____

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

HANSEN, Circuit Judge.

A jury convicted former St. Louis, Missouri, police officers Robert Turner and Guinn Kelly on charges stemming from a scheme to defraud a low-income housing project funded by the United States Department of Housing and Urban Development (HUD). The district court[1] sentenced Turner to 18 months of imprisonment, and Kelly received a 24-month sentence. Turner and Kelly appeal their convictions, and we affirm.

## I.  Background

Cochran Gardens is a low-income housing project located in St. Louis, Missouri, that receives substantially all of its funding from the federal government via HUD. The housing project supplemented its security forces with off-duty police officers. One of the officers hired by Cochran Gardens to supplement its security forces was Guinn Kelly, a sergeant with the St. Louis Police Department. In September 1993, Robert Turner, Kenny Givens, and Rodney Brunson, all of whom were also St. Louis police officers, joined Kelly at Cochran Gardens. Turner and Givens were also partners in the intelligence division of the St. Louis Police Department. Although many other off-duty policemen worked at Cochran Gardens, Kelly, Turner, Givens, and Brunson comprised a special, plainclothes unit charged with investigating drug trafficking, weapons violations, and gathering intelligence. Almost immediately after Kelly, Turner, Givens, and Brunson started working together at Cochran Gardens, the four men began submitting false time cards that overstated the number of hours they worked at the housing project.

_____

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

The scheme was uncovered in the Spring of 1994, and shortly thereafter Brunson pleaded guilty and agreed to cooperate with authorities investigating the matter. A federal grand jury eventually indicted Kelly, Turner, and Givens, and the three men stood trial together. On the fourth day of the trial, the district court declared a mistrial with respect to all of the defendants when it appeared that Givens's attorney might have to testify to impeach a government witness. After the district court denied defense motions to dismiss the indictment on double jeopardy grounds, Turner, Kelly, and Givens appealed. See United States v. Givens, 88 F.3d 608 (8th Cir. 1996). In that case, we concluded that although a mistrial was manifestly necessary with respect to Givens because it was his attorney who might have to testify, there was no manifest necessity for declaring a mistrial with respect to Turner and Kelly. See id. at 613-14. We held, therefore, that double jeopardy considerations barred a retrial of Turner and Kelly on the charges contained in the indictment. See id. at 614.

After our decision in the first appeal, Givens pleaded guilty and agreed to cooperate with authorities. A superseding indictment was filed against Turner and Kelly, which the defendants moved to dismiss on double jeopardy and res judicata grounds. The district court denied the motion, and, with the exception of one count against Kelly, we affirmed. See United States v. Turner, 130 F.3d 815, 820 (8th Cir. 1997), cert. denied, 118 S. Ct. 2071 (1998).

Turner and Kelly's second trial commenced in late September 1998. Brunson and Givens testified for the government and explained how the four officers clocked each other in and out at Cochran Gardens and submitted false time cards so that they would be paid for work they did not perform. Brunson testified that the men actually worked only about 40 percent of the hours reflected on their time cards. Givens testified that the men were required to be at Cochran Gardens at approximately 10 p.m., but that requirement often conflicted with their police duties because they were frequently assigned to work the 6 p.m. to 2 a.m. shift. According to Givens, "we wanted to keep both [jobs], so we showed up and clocked in anyway and as soon as

3

we had a chance, we'd go back to the police department and work." (Trial Tr. Vol. 2 at 162.)

Aside from the testimony of Brunson and Givens, the government presented substantial documentary evidence showing overlaps between the times Turner and Kelly were on duty with the police department and the times they also claimed to be working at Cochran Gardens. In particular, the government submitted the relevant police department duty rosters and corresponding Cochran Gardens time cards. This evidence showed, for example, that between September 23, 1993, and March 11, 1994, Kelly's time overlapped on some 58 occasions, and Turner's time overlapped on 38 occasions. During one seven day period in December 1993, Kelly's overlaps were so large that it appeared as if he worked an average of 22 hours per day, and that he twice worked more than 24 hours in a single day. The government also presented payroll records showing that Turner and Kelly were paid for the time reflected on their Cochran Gardens time cards.

Turner and Kelly offered various explanations for the overlaps between the police department duty rosters and the Cochran Gardens time cards. For example, the defendants maintained that the police department duty rosters were unreliable because they did not reflect the use of an unofficial form of compensatory time (comp time) that was allegedly used to compensate officers for unpaid overtime. According to the defendants, a police officer could submit an overtime slip, take time off, and then the slip would be destroyed upon the officer's return to work.[2] Such a practice, if it existed,

_____

[2] During his opening statement, Turner's counsel offered an explanation as to why officers had to submit an overtime slip in order to take comp time. If an officer was injured while on comp time, the police department might have to pay a worker's compensation claim because the duty roster showed the officer as being on duty. By using an overtime slip, the department could document the fact that the officer was not injured while on duty. If the officer returned from comp time unscathed, the overtime slip could then be torn up and the officer would be paid as if he had been on duty, and

4

would undermine the accuracy of the police department duty rosters because the rosters would show that an officer was on duty when in fact he was not. The government, however, offered evidence showing that although the duty rosters were not infallible, they were generally an accurate reflection of the times police officers were on duty. Furthermore, the government offered direct and circumstantial evidence—unrelated to the duty rosters—showing that the defendants did not work at Cochran Gardens all of the hours reflected on the time cards. For example, Givens and Brunson testified that all four men routinely clocked in and then left Cochran Gardens. In fact, the government produced evidence showing that Turner was clocked in at Cochran Gardens even though he was out of town at a football game.

Kelly faced an additional problem in his attempt to establish the unreliability of the police department duty rosters. As a sergeant, Kelly was ineligible for overtime, so he could not claim that he received unofficial comp time in lieu of overtime pay. When pressed on this matter during cross-examination, Kelly offered several, often confusing, explanations. Eventually Kelly claimed that his position with the police department allowed him to come and go as he pleased without permission from any supervisor. (See Trial Tr. Vol. 5-A at 48-50.) Kelly also maintained that Cochran Gardens gave him a secret bonus of 25 hours per week to compensate him for his service to Cochran Gardens when he was not officially on duty at the housing project.

Aside from the asserted unreliability of the police department duty rosters, the defendants also suggested that the time cards did not accurately reflect the hours they worked at Cochran Gardens, and that there was physically no way they could have falsified the time cards. For example, they claimed that the time cards were locked up and out of their control. This argument, however, was seriously undercut by Brunson's and Givens's testimony. Both Brunson and Givens testified that the time cards were

---

the duty roster would never show that the officer had taken comp time. See Trial Tr. Vol. 1 at 184.

not always stored in a secure location, and in any event, Kelly had a key that allowed the men to gain access to the time cards. Brunson further testified that when the men could not get access to the time cards because Kelly was sick, Kelly later recorded the times by hand. Givens testified that he also had a key, and because he lived near Cochran Gardens, he was often tasked with returning to the housing project, early in the morning, to clock the men out.

Although Turner and Kelly testified at trial and maintained their innocence, the jury found both men guilty of multiple counts of making false statements to HUD, in violation of 18 U.S.C. § 1001, aiding and abetting Kenny Givens in making false statements to HUD, in violation of 18 U.S.C. §§ 1001 and 2, and stealing HUD funds, in violation of 18 U.S.C. § 641. Turner and Kelly both appeal and contest certain evidentiary rulings, as well as the sufficiency of the government's evidence against them. Additionally, Turner contends that he is entitled to a new trial due to several alleged instructional errors, and that Givens's and Brunson's testimony should have been excluded pursuant to 18 U.S.C. § 201(c)(2) (antibribery statute).

## II. Discussion

### A.    Cross-Examination of Kenny Givens

During its case-in-chief, the government questioned Kenny Givens about the accuracy of the police department duty rosters. Givens testified that with the exception of a few isolated incidents, the duty rosters accurately reflected the times police officers worked. On cross-examination, Turner's counsel attempted to elicit testimony regarding comp time. In particular, Givens was asked if he knew of a practice whereby an officer would submit an overtime slip, take a day off, and then the slip would be destroyed upon the officer's return. Givens testified that he was not aware of any such practice in the intelligence division, the division where he and Turner were partners. In an attempt to impeach Givens's credibility on this issue, Turner's counsel sought to

question Givens regarding statements Givens had allegedly made to defense attorneys, including Kelly's attorney, Kurt Schultz, regarding comp time. The district court refused to allow questions relating to conversations Givens had with defense attorneys and would not let Mr. Schultz testify.[3] On appeal, Turner and Kelly contend that the district court infringed their confrontation rights by limiting their cross-examination of Givens.

The Confrontation Clause of the Sixth Amendment secures a defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The defendant's right to confront witnesses, however, does not prevent a trial judge from placing reasonable limits on defense counsel's cross-examination of government witnesses, and the court has wide latitude to impose such limits." United States v. Ortega, 150 F.3d 937, 941 (8th Cir. 1998) (quotations and brackets omitted), cert. denied, 119 S. Ct. 837 (1999). Therefore, "[a]bsent a clear abuse of discretion and a showing of prejudice, we will not reverse a district court's ruling limiting cross-examination of a prosecution witness on the basis that it impermissibly infringed [a defendant's] right of confrontation." United States v. Stewart, 122 F.3d 625, 627 (8th Cir. 1997).

Having carefully reviewed the relevant portions of the trial transcript, we cannot say that the district court clearly abused its discretion in limiting the cross-examination of Givens. Even if we assume that Givens made prior inconsistent statements regarding comp time to Mr. Schultz or other defense attorneys, those statements were not given under oath and thus did not qualify as substantive evidence under Federal Rule of Evidence 801(d)(1)(A) (prior statement by a witness). As such, Givens's alleged statements would have only been admissible for the limited purpose of impeaching

---

[3] The district court expressed concerns that defense counsel might be angling for another mistrial and accused counsel of "playing games" with the court. (Trial Tr. Vol. 3 at 135-37.)

7

Givens's credibility, and not as substantive evidence that the alleged comp time practice actually occurred at the police department. See Fireman's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1311 (8th Cir. 1993) (noting that a prior inconsistent statement may be admissible under Fed. R. Evid. 613(b) for impeachment purposes, but not for the truth of the matter contained therein). In fact, had defense counsel been allowed to cross-examine Givens with respect to the statements he allegedly made to Mr. Schultz, the government would have been entitled to have the jury "instructed that the evidence was admissible only to impeach [Givens] and not as evidence of a material fact." Id. at 1312.

In any event, the district court allowed the defendants to cross-examine Givens extensively on issues related to Givens's credibility. The district court permitted defense counsel to question Givens regarding any prior inconsistent statements Givens may have made to nonlawyers regarding comp time. Further, the district court permitted questioning that directly undercut the accuracy of the duty rosters. For example, defense counsel questioned Givens regarding a personal trip Givens had taken to North Carolina when the duty roster showed him as being on duty. In response, Givens admitted that it was possible that the duty roster inaccurately showed him as being on duty when he was in North Carolina. Finally, defense counsel cross-examined Givens regarding his motivation to testify favorably for the government due to his plea agreement. In view of the foregoing, we conclude that "[t]he jury's ability to judge [Givens's] reliability was not significantly reduced" when the district court excluded from the scope of cross-examination questions regarding what Givens had allegedly told defense attorneys about comp time. United States v. Dempewolf, 817 F.2d 1318, 1321 (8th Cir.), cert. denied, 484 U.S. 903 (1987). Consequently, we cannot say that the district court clearly abused its discretion, given its history with the prior mistrial.

We further conclude that the defendants have failed to show any meaningful prejudice attributable to the district court's decision to limit the cross-examination of Givens. See Stewart, 122 F.3d at 627 (noting that the court will not reverse a district

8

court's evidentiary ruling absent a showing of abuse of discretion <u>and</u> prejudice). Turner and Kelly contend that Givens's testimony was critical to the government's case, and that the case against them essentially boiled down to a swearing match between Givens and the defendants. Therefore, according to Turner and Kelly, it was crucial to their defense that they be allowed to cross-examine Givens as to what he told Kurt Schultz, and possibly other defense attorneys, about the existence of comp time.

Although Givens's testimony was no doubt damaging to the defendants' cases, we cannot ascribe such critical significance to his specific testimony regarding comp time. Givens was not the only witness to testify as to the accuracy of the police department duty rosters. For example, Ed Naeger, a detective in the St. Louis police department during the time in question, also testified that the duty rosters accurately reflected the hours officers worked. Mr. Naeger further testified that he had heard of comp time, but that such a practice did not occur in the intelligence division of the police department, the division in which Turner and Givens were partners while they moonlighted at Cochran Gardens. (<u>See</u> Trial Tr. Vol. 4 at 63.) Furthermore, Rodney Brunson's testimony provided substantial evidence against the defendants that did not hinge on the accuracy of the police department duty rosters. According to Brunson, the four men worked approximately 40 percent of the hours reflected on the Cochran Gardens time cards, and the men coordinated who would be responsible for punching each other's time cards. Brunson also testified that although the four had been assigned to a special investigative unit at Cochran Gardens, he could not recall that the unit ever actually performed those duties. Finally, as a sergeant, Kelly was ineligible for overtime pay, thus he could not claim, as did Turner, that he received unofficial comp time in lieu of paid overtime.

Turner and Kelly further maintain that the district court infringed their confrontation rights when the court limited Turner's cross-examination of Givens with respect to video surveillance conducted by Givens. According to the defendants, Givens conducted the video surveillance in an effort to defend himself prior to the time

that he pleaded guilty. The district court allowed counsel for Turner to make an offer of proof, but concluded that the surveillance evidence was not admissible because, inter alia, it related to events occurring after the indictment. We have reviewed the relevant portions of the record, and we cannot say that the district court clearly abused its discretion in limiting the cross-examination of Givens with respect to the video surveillance. Furthermore, the defendants have failed to attribute any legally meaningful prejudice to this evidentiary decision of the district court.

In sum, we hold that the district court did not clearly abuse its discretion in limiting the cross-examination of Givens. We further hold that the defendants are not entitled to a reversal because they have failed to show any meaningful prejudice attributable to the district court's decision to limit the cross-examination of Givens. Because of our decision on this issue, we do not reach the separate question of whether Givens's alleged statements to defense counsel regarding comp time were also independently excludable under a joint-defense privilege.

## B.    Business Records Evidence

The government produced substantial documentary evidence against Turner and Kelly. During its case-in-chief, the government introduced Cochran Gardens' time cards and payroll records clearly showing overlaps between the times Turner and Kelly were allegedly working at Cochran Gardens and the times reflected on the police department duty rosters. Turner and Kelly contend that the district court erred in admitting these records into evidence over their hearsay objections. We may reverse a district court's determination regarding the admissibility of evidence only upon a showing that the district court clearly abused its discretion. See Resolution Trust Corp. v. Eason, 17 F.3d 1126, 1131 (8th Cir. 1994). As we explain below, we conclude that the district court did not clearly abuse its discretion in admitting the time card and payroll evidence in this case.

We first reject Turner and Kelly's argument that the time card and payroll evidence contained hearsay upon hearsay.[4] The fact that a business document may contain entries in different forms or even from different sources does not necessarily imply that a hearsay upon hearsay problem exists. When a single business record contains different information recorded directly from multiple sources, or on multiple occasions, there may be several instances of hearsay, but there is only one layer of hearsay. For example, if one employee records his time on a time card each day and a supervisor signs the card prior to submitting it to the payroll department, the time card contains hearsay entries from both the employee and the supervisor, but only one layer of hearsay. On the other hand, when the source of information and the recorder of that information are not the same person, the business record contains hearsay upon hearsay. If both the source and recorder of the information were acting in the regular course of the organization's business, however, the hearsay upon hearsay problem may be excused by the business records exception to the rule against hearsay. See Grogg v. Missouri Pac. R.R. Co., 841 F.2d 210, 213-14 (8th Cir. 1988); Fed. R. Evid. 803(6). Because the defendants offer no credible assertion that an outsider to the chain of producing the time card and payroll records (i.e., a person not acting in the regular course of Cochran Gardens' business) provided any of the information contained in those records, we conclude that the district court did not clearly abuse its discretion in admitting the records over the defendants' hearsay upon hearsay objection.

Having rejected the defendants' hearsay upon hearsay argument, we must next consider whether the district court abused its discretion in admitting the time cards and payroll records under the business records exception. See Fed. R. Evid. 803(6). Rule 803(6) allows for the admission of business records

---

[4] Although the defendants use the term "double hearsay," we prefer the term "hearsay upon hearsay" because it more accurately describes the evidentiary issue.

11

made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the . . . record . . ., all as shown by the testimony of the custodian or other qualified witness.

Fed. R. Evid. 803(6).

In this case, the government called Ms. Calea Stovall-Reid, the records custodian for the St. Louis Housing Authority, to lay the foundation for the introduction of the time cards and payroll records.[5] As the custodian, Ms. Stovall-Reid's testimony would normally be sufficient to lay the foundation for the introduction of Cochran Gardens' business records. Ms. Stovall-Reid, however, had never seen the documents until shortly before the trial. Out of an abundance of caution, the government read into evidence the former testimony of Ms. Norma Bell, the records custodian who laid the foundation for the introduction of the time cards and payroll records at the first trial.[6] Notwithstanding the testimony of Ms. Stovall-Reid and Ms. Bell, Turner and Kelly contend that the government failed to lay a sufficient foundation for the introduction of the time card and payroll evidence, and, therefore, the district court abused its discretion in admitting the evidence under the business records exception to the rule against hearsay. See Fed. R. Evid. 803(6). As with most evidentiary decisions, we may reverse a district court's determination of the adequacy of the foundation laid for

[5] The St. Louis Housing Authority took over the management of Cochran Gardens from the Cochran Gardens Tenant Management Corporation in June 1998, after the first trial for which the records had been subpoenaed. Therefore, at the time of the second trial, although the St. Louis Housing Authority was responsible for maintaining Cochran Gardens' business records, it did not possess the records because they had been turned over pursuant to the subpoena.

[6] The defendants do not contest the fact that Ms. Bell was unavailable to testify because she could not be located.

12

the admission of evidence only if the district court clearly abused its discretion. See United States v. Franks, 939 F.2d 600, 602 (8th Cir. 1991).

A sponsoring witness need not possess or even see the records in question before trial. See United States v. Coohey, 11 F.3d 97, 99-100 (8th Cir. 1993) (holding that a sponsoring witness could authenticate phone records even though she had not seen or possessed the records prior to trial). In Coohey, we specifically noted that even if the witness "was not the keeper of the records and did not prepare them, . . . [that] would not impede her ability to testify that the records were authentic." Id. at 100. See also id. at 100 n.2 (applying the same rationale to arguments specifically directed to the foundation required under Fed. R. Evid. 803(6)). "Evidence is admissible if the trial judge is satisfied, after consideration of such factors as the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood that it has been tampered with, that the evidence has not in all reasonable probability been changed in any significant respect." Id. at 100. Further, "Rule 803(6) is satisfied if the custodian 'demonstrates that a document has been prepared and kept in the course of a regularly conducted business activity.'" Franks, 939 F.2d at 602 (quoting United States v. Pfeiffer, 539 F.2d 668, 671 (8th Cir. 1976)). Having reviewed the relevant portions of the trial transcript, we conclude that the testimony of Ms. Stovall-Reid and Ms. Bell sufficiently established that the time cards and payroll records had been prepared and kept in the regular course of Cochran Gardens' business. Further, Brunson's and Givens's testimony established how the time entries on the time cards were made. We cannot say, therefore, that the district court clearly abused its discretion in admitting the time card and payroll evidence over the defendants' objections.

Finally, Turner contends that his confrontation rights were violated when the district court allowed the government to read Ms. Bell's former testimony into evidence. Because Ms. Bell was unavailable to testify at the second trial, and she testified at the first trial under oath and was then subject to cross-examination by Turner, there would

normally be no problem reading her former testimony into evidence. <u>See</u> Fed. R. Evid. 804(b)(1) (permitting the introduction of an unavailable witness's former testimony "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination"). Furthermore, Turner does not argue that the time cards and payroll records were improperly admitted at the first trial. Rather, Turner asserts that his confrontation rights were violated in the instant case because he was unable to impeach Ms. Bell's credibility with new evidence regarding Ms. Bell's alleged illegal activities, as contained in an FBI memo. We find this argument unpersuasive.

The government read Ms. Bell's former testimony into evidence solely to lay the foundation for the admission of the time card and payroll evidence. There is no credible assertion that the evidence contained in the FBI memo was either directly admissible or proper subject matter for cross-examination. The record does not show that Ms. Bell had been convicted on any felony grade charges related to the alleged illegal activities, and we reject the naked assertion that such evidence relates to Ms. Bell's motive or bias to testify falsely in laying the foundation for the business records in question. Simply stated, the district court did not infringe Turner's confrontation rights by permitting the government to read Ms. Bell's former testimony into evidence.

We hold that the district court did not abuse its discretion in admitting the time card and payroll evidence. We further hold that the district court did not violate Turner's confrontation rights when it permitted the government to read Ms. Bell's former testimony into evidence.

## C.    **Jury Instructions**

Turner claims that he is entitled to a new trial due to several alleged instructional errors. We review a district court's jury instructions for abuse of discretion. <u>See</u> <u>United States v. Tucker</u>, 169 F.3d 1115, 1119 (8th Cir. 1999). In so doing, we do not

14

consider portions of a jury instruction in isolation, but rather consider the instructions as a whole to determine if they fairly and adequately reflect the law applicable to the case. See id.

Turner first claims that Instruction No. 11 impermissibly "allowed the jury to return guilty verdicts for offenses that were committed 'on or about' certain dates." (Appellant Turner's Br. at 37.) Instruction No. 11 reads as follows:

> You will note the indictment charges that the offenses were committed "on or about" certain dates. The proof need not establish with certainty the exact dates of the alleged offenses. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offenses were committed on dates reasonably near the dates alleged.

Turner cites no authority for his proposition that using "on or about" in the instruction was improper, and we find no error. See United States v. Williams, 657 F.2d 199, 202-03 (8th Cir. 1981) (approving a substantially similar "on or about" instruction); see also United States v. Duke, 940 F.2d 1113, 1120 (8th Cir. 1991) ("The law is clear that the use of 'on or about' in an indictment relieves the government of proving that the crime charged occurred on a specific date, so long as it occurred within a reasonable time of the date specified."); 1 Edward J. Devitt, et al., Federal Jury Practice and Instructions § 13.05 (4th ed. 1992) (collecting examples of similar federal pattern criminal jury instructions explaining a jury's duty when a count in the indictment uses "on or about" language).

Turner further suggests that Instruction Nos. 16 and 18 were improper because those instructions did not follow the Eighth Circuit Model Instructions. We have held that the Eighth Circuit Model Instructions are not binding on the district courts of our circuit, and therefore, we decline to ascribe error solely because a district court's instructions deviated from the model instructions. See United States v. Jones, 23 F.3d 1407, 1409 (8th Cir. 1994).

We also reject Turner's contention that Instruction No. 16 improperly defined materiality. Instruction No. 16 defined the elements of making a false, fictitious, or fraudulent statement in a matter within the jurisdiction of a federal agency, in violation of 18 U.S.C. § 1001. In particular, the instruction required the jury to decide whether the alleged false statement or representation was material, and instructed the jury that "[a] statement or representation is 'material' if it has a natural tendency to influence or be capable of influencing the decision to make payments of money." (Instruction No. 16.) According to Turner, Instruction No. 16 permitted the jury to make a finding of materiality without specifically requiring the jury to find that Turner's false time cards were material to the government.

The Supreme Court has held that the question of whether a statement or representation is material within the meaning of 18 U.S.C. § 1001 is a matter for the jury to decide. See United States v. Gaudin, 515 U.S. 506, 522-23 (1995) (holding that a trial judge's refusal to submit the issue of the materiality of a defendant's false statements infringed the defendant's right to have a jury determine every element of the charged offense beyond a reasonable doubt). In the instant case there is no dispute that the district court committed the question of materiality to the jury, and we find no error in the fact that Instruction No. 16 defined materiality generally, rather than by specific reference to HUD. See United States v. Richmond, 700 F.2d 1183, 1188 (8th Cir. 1983) ("To establish materiality of a false statement it is not necessary to show that a government agency actually relied on the statement, that the government suffered pecuniary loss as a result of the statement, or that the false statement was sufficient to induce a payment or benefit."), abrogated on other grounds, United States v. Raether, 82 F.3d 192 (8th Cir. 1996).

Finally, we cannot accept Turner's claim that Instruction No. 18 was improper because it permitted him to be convicted of violating 18 U.S.C. § 641 without any

16

position. Turner's reliance on <u>Owen</u> is misplaced. In <u>Owen</u>, the Tenth Circuit specifically declined to decide the question of whether federal grant money in the hands of a grantee was money that belonged to the United States for purposes of 18 U.S.C. § 641. <u>See</u> <u>id.</u> at 343. Rather, the court simply concluded that there was insufficient evidence showing that the money taken by the defendant had come from HUD. <u>See</u> <u>id.</u> at 343 ("We need not decide whether the grant money was 'money . . . of the United States' under § 641 because there is insufficient evidence to warrant a finding that any of the money . . . was HUD grant money."). We labor under no such difficulty in this case. Turner stipulated that during the relevant time frame, HUD provided substantially all of the funds for Cochran Gardens' operating budget, including security costs, and that the funds were federal funds. (<u>See</u> Trial Tr. Vol. 3 at 263.) In view of this stipulation, we find no error in Instruction No. 18. <u>Cf.</u> <u>United States v. Gjerde</u>, 110 F.3d 595, 601 (8th Cir.) (rejecting an argument that HUD grant money in the hands of a state grantee deprived the funds of their federal character), <u>cert.</u> <u>denied</u>, 118 S. Ct. 367 (1997); <u>United States v. Scott</u>, 784 F.2d 787, 791 (7th Cir.) (distinguishing <u>Owen</u> when the federal funding at issue was continuous), <u>cert.</u> <u>denied</u>, 476 U.S. 1145 (1986).

Turner is not entitled to a new trial due to the challenged jury instructions.

## D.     <u>Other Issues</u>

Finally, Turner and Kelly claim that there was insufficient evidence to support their convictions. Additionally, Turner contends that the testimony of Givens and Brunson should have been excluded pursuant to 18 U.S.C. § 201(c)(2). As our review of the evidence above demonstrates, we have carefully considered the sufficiency argument and we find it to be without merit. Turner's 18 U.S.C. § 201(c)(2) argument is foreclosed by <u>United States v. Mosby</u>, 177 F.3d 1067, 1069-70 (8th Cir. 1999).

## III. Conclusion

The district court's judgments with respect to Turner and Kelly are affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.