**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Miriam SANTOS, Defendant–Appellant.**

**No. 99–2934.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1999.

Decided Jan. 19, 2000.

---

954

Jerome N. Krulewitch (argued), Office of the U.S. Attorney, Criminal Appellate Division, Chicago, IL, for plaintiff–appellee.

David J. Stetler (argued), Stetler & Duffy, Chicago, IL, for defendant–appellant.

Reuben L. Hedlund, Hedlund, Hanley & John, Chicago, IL, for Amicus Curiae.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

Miriam Santos, the Treasurer of the City of Chicago, was convicted of having violated the federal mail fraud and extortion statutes by extorting campaign contributions from banks and securities firms that hold or invest funds controlled by the Treasurer's office. 18 U.S.C. §§ 1341, 1951. She was sentenced to serve 40 months in prison and to pay restitution in excess of $50,000, and she appeals, raising a number of issues. We begin with the issue of whether her constitutional right to the assistance of counsel was infringed.

She had been indicted on January 27, 1999, shortly after retaining a lawyer named David Stetler to defend her. At her arraignment on February 3 the government's lawyer asked the district judge to set the case for trial in late April or early May. Stetler pointed out that he was scheduled to begin a three- to four-month trial before a different federal district judge on February 15 and so couldn't represent Santos if her trial began at the time suggested by the government. The judge answered Stetler by scheduling the trial for April 14, explaining that he did "not intend to delay this case for three or four months while you engage in other matters." Stetler was not seeking a delay

of "three or four months." A four-month trial beginning on February 15 would end in the middle of June, little more than a month after the latest date suggested by the government. Stetler promised that during his other trial he would prepare for the Santos trial and that he wouldn't seek a further continuance. He had a trial scheduled for July as well but was confident the schedule would not hold (in fact it did not), and so far as appears the issue did not figure in the judge's denial of the motion for a continuance; the judge gave many reasons for denying the motion but not that one, perhaps because Stetler had promised to stand aside if the other trial went forward in July and to have another lawyer represent Santos at her trial.

On February 10 Stetler filed a formal motion to continue the Santos trial until July. Although the government did not oppose the motion, the district judge denied it. His grounds were that a criminal trial should begin within 70 days after indictment (that being the period of "non-excludable" time allowed by the Speedy Trial Act, 18 U.S.C. § 3161(c)(1), though few federal criminal trials take place so soon because exclusions are generously granted for a host of reasons authorized by the Act, § 3161(h)); that the federal judicial system would collapse if judicial schedules had to accommodate the prior commitments of busy lawyers; that any defendant who wanted to avoid a speedy trial could do so just by hiring a busy lawyer; that Santos has a high salary and could therefore afford to hire another good lawyer to replace Stetler; that she has a right to a prompt trial; that another lawyer in Stetler's office had filed an appearance (though he was a young lawyer who had never tried a case); and—the ground the judge particularly stressed—that when a public official is accused of abusing the office that he occupies, "the public has a tremendous issue [*sic*—the word must be 'interest'] in knowing whether the government can prove these allegations beyond a reasonable doubt."

So Stetler withdrew and on February 26 Chris Gair, a lawyer with another law firm,

filed his appearance on Santos's behalf. The trial began as scheduled on April 14 and concluded on May 3.

■ The Sixth Amendment entitles a federal criminal defendant to the assistance of counsel. The government concedes as it must in light of the cases that this entitlement is infringed by the arbitrary denial of a continuance when the effect is to deny the defendant the lawyer of his choice. This is so even if the defendant is able to hire another competent, perhaps equally or even more competent, lawyer—otherwise, of course, there would not be a right to counsel *of one's choice*. Though some cases contain language inconsistent with this proposition—language which suggests that the arbitrary denial of a continuance is actionable only if it prevents the defendant either from being represented by counsel at all or from being effectively represented, see; e.g., *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *United States v. Harris*, 2 F.3d 1452, 1455 (7th Cir.1993); *United States v. Arena*, 180 F.3d 380, 397 (2d Cir.1999)—these cases assume, and other cases, e.g., *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), make clear, that there is indeed a constitutional right to counsel of one's choice, although it is less extensive than the other rights to counsel in the Sixth Amendment. See, e.g., *id.* at 159–60, 108 S.Ct. 1692; *United States v. Hughey*, 147 F.3d 423, 431 (5th Cir.1998); *United States v. Sampson*, 140 F.3d 585, 591 (4th Cir.1998).

■ But appellate review of a ruling, denying a continuance, that is alleged to infringe the right to counsel of one's choice is deferential. E.g., *United States v. Harris, supra,* 2 F.3d at 1455; *United States v. Hughey, supra,* 147 F.3d at 431; *United States v. Sampson, supra,* 140 F.3d at 591. In deciding whether there was an abuse of discretion the appellate court must consider both the circumstances of the ruling and the reasons given by the judge for it. The salient circumstances here are that the

case was not old, the indictment having come down only two and a half months before the scheduled trial date, so that if the continuance was granted the case would be tried within five months of indictment; the government did not oppose the continuance; and the judge had no scheduling conflict that would have led to a further delay had he granted the continuance. Nothing in these circumstances indicated that the grant would pose a hardship to anyone, and on the other side there was the defendant's interest, one of constitutional dignity, in being represented by the lawyer of her choice.

 So we must attend carefully to the judge's reasons for denying the continuance. With all due respect, they do not hold water. The appearance by an inexperienced associate of Stetler's was an irrelevancy, as was the 70–day provision of the Speedy Trial Act, which is intended to assure not that federal criminal trials start in 70 days (they rarely do) but that the *unexcused* delay in bringing a case to trial not exceed that period. 18 U.S.C. §§ 3161(c)(1), (h); *United States v. Spring*, 80 F.3d 1450, 1456 (10th Cir.1996). An express basis for excusable delay is that it is necessary in order for the defendant to obtain counsel or to enable the defendant's counsel to prepare adequately for trial. § 3161(h)(8)(B)(iv). As for a defendant's right to a speedy trial, that is a right of the defendant. 18 U.S.C. § 3162(a)(2); cf. *Barker v. Wingo*, 407 U.S. 514, 528–29, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). And it has never been suggested that Santos engaged Stetler for the purpose of delaying her trial. If the fact that she might be able to hire a good lawyer to replace him (as she did) was a good reason for denying the continuance, the right to counsel of one's choice would be eviscerated for any person with a high salary, which seems to us to take class warfare too far.

 We are also perplexed by the district judge's belief that it is the duty of a federal district judge to rush public officials to trial lest they continue to abuse their office. Santos is a municipal official rather than a federal official, and it is up to the city or the state, or to the United States in its capacity as enforcer of federal laws designed to deter public corruption at all levels of American government, to decide whether an indicted official should be permitted to retain her office until the charges against her are resolved. See, e.g., Fla. Stat § 112.51(2) (authorizing the governor to suspend any elected or appointed municipal official who is indicted). No one but the district judge thought it important that Santos's trial begin in April rather than the end of June or beginning of July. This answers, incidentally, any contention that the government has its own right to a speedy trial. Certainly the government has an interest in the expeditious conduct of its prosecutions, but remember that it did not object to the continuance sought by Stetler. We conclude that it was an abuse of discretion to deny the continuance.

A more difficult question is the consequence of an improper denial of the right to counsel of one's own choice in a case in which the defendant is able to hire a highly competent substitute lawyer as a replacement and there is no contention—for there is none here—that the defendant would have had a better chance of winning with her original lawyer. The judge's error, in short, was harmless, but Santos argues that the denial of the right to counsel of one's choice is one of those so-called "structural" errors that are reversible per se (as recently reaffirmed in *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999)), because the error either is serious yet its effect on the outcome of the particular case difficult to establish (an example is the denial of the right to a jury trial, e.g., *Sullivan v. Louisiana*, 508 U.S. 275, 280–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 92 L.Ed.2d 460(1986)) or infringes a right unrelated or only distantly related to the interest in making sure (so far as possible) that innocent people aren't convicted; allowing racially motivated peremptory chal-

lenges of prospective jurors is an example. E.g., *Neder v. United States, supra*, 119 S.Ct. at 1833; *Smith v. Farley*, 59 F.3d 659, 663 (7th Cir.1995).

That denying the counsel of one's choice falls into either category is not an easy position to maintain in this circuit after *United States v. Turk*, 870 F.2d 1304, 1307-08 (7th Cir.1989), which says that proof of prejudice is required in a case in which the defendant is complaining of such a denial. See also *United States v. Arena, supra*, 180 F.3d at 397. Most cases hold the contrary, however, such as *United States v. Rankin*, 779 F.2d 956, 960-61 (3d Cir.1986), which relies on *Flanagan v. United States*, 465 U.S. 259, 267-68, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984)—not cited in *Turk*—where the Supreme Court intimated that obtaining a reversal of a conviction because of the denial of the defendant's right to a lawyer of his choice "does not require a showing of prejudice to the defense, since the right reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding." A number of cases line up with *Rankin*. See, e.g., *Crandell v. Bunnell*, 144 F.3d 1213, 1216 (9th Cir.1998); *United States v. Voigt*, 89 F.3d 1050, 1074 (3d Cir.1996); *United States v. Childress*, 58 F.3d 693, 736 (D.C. Cir.1995) (per curiam); *United States v. Panzardi Alvarez*, 816 F.2d 813, 818 (1st Cir.1987).

The language that we have quoted from *Flanagan* suggests that the right to counsel of one's choice falls into the second subcategory of "structural" errors that we have identified. Subsequent cases, however, of which the most recent is *Neder v. United States, supra*, 119 S.Ct. at 1833, contain language that, consistent with the limited and qualified nature of the right to counsel of one's choice, see, e.g., *Wheat v. United States, supra*, 486 U.S. at 159-60, 108 S.Ct. 1692; *Morris v. Slappy, supra*, 461 U.S. at 11-14, 103 S.Ct. 1610; *United States v. Messino*, 181 F.3d 826, 830-31(7th Cir.1999), seems to confine the rule of automatic reversal of denials of the right to assistance of counsel to cases of *complete* denial. Cf. *United States v. Cronic*, 466 U.S. 648, 658-59, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). That a district judge has a broad discretion to extinguish the right to counsel of one's choice for reasons of calendar control suggests that this right, which in any event no indigent criminal defendant has, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *Wheat v. United States, supra*, 486 U.S. at 159, 108 S.Ct. 1692; *United States v. Messino, supra*, 181 F.3d at 831, is, like the right to effective assistance of counsel (a right whose vindication requires proof of prejudice, *Strickland v. Washington*, 466 U.S. 668, 691-96, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984)), not so fundamental as the rights protected by the rule of automatic reversal.

■ The strongest argument for bringing the right to counsel of one's choice under that rule is practical, and also resembles a part at least of the rationale for the first class of "structural" errors. Prejudice will not be provable unless the replacement counsel failed to render effective assistance, an independent constitutional violation, and so the right to the lawyer of one's choice will be empty because unenforceable—had the district judge disqualified Stetler because Stetler parts his hair on the right side Santos would have no remedy. But this argument is overstated in at least two respects. First, it will sometimes be possible to prove prejudice even though the replacement lawyer didn't render ineffective assistance. If he is inexperienced, or lacks some specialized knowledge that the defendant's original choice of lawyer had, it may be possible to show that even though his representation of the defendant was not ineffective it was substantially less likely to achieve acquittal. Second, and more important, mandamus is an available remedy when an abuse of discretion by the trial judge cannot effectively be remedied by appealing the final decision,

e.g., *Mallard v. United States District Court*, 490 U.S. 296, 309, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989); *In re BBC Int'l, Ltd.*, 99 F.3d 811, 812 (7th Cir.1996); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1294–95 (7th Cir.1995); *In re Papandreou*, 139 F.3d 247, 250(D.C. Cir.1998), for example an abuse of discretion in disqualifying a party's lawyer. *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 378 n. 13, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) (dictum); *In re Sandahl*, 980 F.2d 1118, 1119–20 (7th Cir.1992); *In re Barnett*, 97 F.3d 181, 183–84 (7th Cir.1996). Mandamus would fit this case to a T, since the district judge did abuse his discretion by refusing to grant a continuance and Santos would be unlikely to be able to prove prejudice since she could and did hire a competent replacement lawyer.

We need not pursue the issue further, since if Santos is entitled to a new trial on other grounds—and we are about to see that she is—the issue washes out; she can hire Stetler to represent her at the retrial. In the unlikely event that the district court prevents her from doing so for reasons that constitute an abuse of discretion, she can, as just suggested, seek correction by asking this court for a writ of mandamus.

■ The other grounds pressed on this appeal primarily concern errors allegedly committed by the district judge during the trial; but there is one pretrial ruling besides the denial of the continuance that is challenged, and it turns out to be infected by that denial. The central item of evidence in the government's case, we were told at argument by its lawyer (who was also the prosecutor in the district court), was a tape recording of a phone conversation between Santos and an employee of one of the contractors from whom she was seeking campaign contributions. Statements made by Santos in that conversation ("I don't understand why the firm is so recalcitrant to help out the people that helped them"; "When they came in here and sat in my office and asked for business and asked for help, we were there. Never asked for a damn thing"; "When they sat

in here and asked for my time and asked for my help and asked for my business I was there. Now it's time for people to belly up") are probative of extortion. She doesn't argue that there was insufficient evidence to convict her on any of the counts on which the jury rendered a verdict against her.

But not content with the words, the prosecutor asked the jury in opening argument to "notice her tone and her demeanor," in order to help the jury to interpret her words as extortionate; and in closing argument he told the jury that Santos had chosen the "tone" she had used in making the allegedly extortionate demands. In so saying he was perhaps reminding the jury that the other party to the taped conversation had testified that Santos was "hollering" at her and "was very excited," and so in cross-examining Santos the prosecutor asked her whether her tone had not been "sarcastic" and said to her that "your voice was raised." Anticipating that the prosecution would make an issue of Santos's tone, her lawyer had asked the judge two days before the trial began to permit him to call a doctor to testify that Santos's thyroid condition may have affected her tone of voice. The district judge had refused to permit this, on the ground that the lawyer should have designated the witness earlier in order to give the government a chance to counter the witness's testimony.

Told that Santos sounded angry or excited, or even just that her "tone" gave her away, jurors might be more inclined to credit the prosecutor's interpretation of the conversation as a threat rather than a plea. Because, in consequence of the judge's refusal to grant a continuance, Santos had a lawyer who was new to the case, he can't be blamed for not having tendered his expert witness on tone of voice earlier. Nor is it very plausible that the U.S. Attorney's Office could not have found its own endocrinologist to listen to the tape and review Santos's medical records and offer an opinion on whether her

voice might have been altered by her thyroid condition. That might have been difficult to do in 48 hours, but the trial lasted for almost three weeks and the evidence about Santos's tone of voice could have been postponed to a later stage of the trial. In the circumstances, the judge should have allowed Santos to present limited medical evidence to help the jury interpret her tone. See generally *United States v. Hall*, 93 F.3d 1337, 1341–44 (7th Cir.1996). He did allow her to testify that she was feeling irritable at the time of the call, but by refusing to allow evidence that would have made her self-serving testimony plausible he prevented her from countering the government's "tone" argument effectively.

■ The tape-recorded call was one of several that Santos and her deputy John Henry made to contractors during June 1998, when Santos was a candidate for Attorney General of Illinois, in an effort to raise money for the Illinois Democratic Party so that she could participate in a series of polls that the Party was planning to commission. The government presented evidence that the contractors who were solicited by Henry yet refused to contribute were denied new business with the City Treasurer's office even though they were the low bidders; the government argued that until June 1998 the office always had given the business to the low bidder. The district judge refused to permit Santos to counter this evidence with evidence that some of the recalcitrant contractors were not cut off and that nonextorted low bidders didn't always get the office's business. The judge's ground for the exclusion was that the evidence was merely evidence of "good acts" and thus was irrelevant to the charges in the indictment, since the government was not contending that *every* transaction by the City Treasurer's office during the period covered by the indictment was corrupt.

■] This was a misunderstanding of the evidence, and it persisted despite the repeated and lucid attempts by Santos's lawyer to dispel it. As he explained over and over again, the point of the evidence was to cast doubt on the government's theory that the contractors who were cut off by the Treasurer's office were cut off *because* they had refused to "belly up." If some of the recalcitrants were spared and if low bidders don't always get the office's business even if no retaliatory motive is in play, this is some evidence that the pleas for campaign contributions were not threats. It was weak evidence; the fact that a threat is not always carried out is not strong evidence that it was not made. But the judge, misunderstanding the purpose for which the evidence was being offered, never considered whether its probative value might be clearly outweighed by its likely effect in confusing the jury, thus warranting exclusion under Fed. R.Evid. 403. Moreover, had he wished to exclude the evidence on this basis, he would have been required at the same time to forbid the government to argue that until the period of the alleged extortion the low bidders had always won the contracts with the Treasurer's office. For it is improper to prevent a party from countering possibly false testimony favorable to his opponent even if that testimony should not have been admitted. E.g., *United States v. Chaimson*, 760 F.2d 798, 810 (7th Cir. 1985); *Griffin v. Washington Convention Center*, 142 F.3d 1308, 1312(D.C. Cir.1998); *United States v. Baird*, 29 F.3d 647, 653–54 (D.C. Cir.1994); 1 John W. Strong, *McCormick on Evidence* § 57, p. 255 (5th ed.1999). That aside, since the judge misunderstood the purpose for which the evidence was being offered and thus failed to exercise a properly informed discretion, his Rule 403 ruling cannot be upheld unless it would have been an abuse of discretion for him to have admitted the evidence, and it would not have been. *Carr v. O'Leary*, 167 F.3d 1124, 1127 (7th Cir. 1999); *United States v.Guy*, 140 F.3d 735, 736 (7th Cir.1998); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 744(7th Cir.1997).

■ A good deal of inadmissible testimony was admitted. The actual cutoffs of recalcitrant contractors were ordered by

John Henry, but employees of the Treasurer's office were permitted to testify that they had "no doubt" or a "personal feeling" that Santos had ordered Henry to order the cutoffs. With immaterial exceptions, witnesses are permitted to testify only to matters within their personal knowledge. Fed.R.Evid. 701. The government defends the admission of these employees' testimony on the ground that they were familiar with Santos's management style, which they described as intrusive and dictatorial. They were indeed entitled to so testify. *United States v. Williams*, 81 F.3d 1434, 1442 (7th Cir. 1996); *United States v. Saulter*, 60 F.3d 270, 276 (7th Cir.1995); *United States v. Allen*, 10 F.3d 405, 414 (7th Cir.1993); *Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1061 (7th Cir.1987); *United States v. Gaines*, 170 F.3d 72, 77 (1st Cir.1999). The way in which Santos managed the Treasurer's office—a small office—was a matter within the range of these witnesses' personal observation. Had they stopped with their testimony about Santos's management style, the prosecutor could have asked the jury to infer that it was likely that Henry would not have ordered the cutoffs himself, that he was just her messenger boy. But instead the witnesses were permitted to draw the inference themselves, and in doing so they stepped outside the boundaries of their personal knowledge and invaded the province of the jury. *Stagman v. Ryan*, 176 F.3d 986, 995–96 (7th Cir.1999).

■ It is true that Rule 701 does not interdict all inference drawing by lay witnesses. That would be absurd, since almost all testimony, even testimony as to what one has seen, is inferential in the sense that a reasoning process, however rudimentary, is being applied to the raw sense data. *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir.1990). But the inferences must be tethered to perception, to what the witness saw or heard. What the witnesses here saw and heard was how Santos managed the office, but it was an impermissible leap to infer the existence of an express order by Santos on a particular matter. Not because the witnesses were not expert witnesses, who are permitted to testify to matters of which they lack personal knowledge, but because the inferences that they tried to draw were too speculative to count as evidence.

■ Patricia Errera, another employee of the Treasurer's office, filed several complaints about Santos with the City's Board of Ethics. The judge ruled that these complaints were admissible under the business-records exception to the hearsay rule. Fed.R.Evid. 803(6). This ruling was clearly incorrect. Businesses have incentives to keep accurate records germane to their business, and so the material contained in those records is more likely to be truthful than the average hearsay. But that is provided that this material—the statements sought to be used in evidence for their truth value—was created or adopted by the business record keeper. *United States v. Vigneau*, 187 F.3d 70, 75–76 (1st Cir.1999); *United States v. Turner*, 189 F.3d 712, 719–20 (8th Cir.1999). The reason is inapplicable to information received rather than prepared by the business. The fact that statements made by strangers to the business become a part of its records, such as the complaints which were placed in the Board of Ethics' files, does not make them business records unless they are verified by the business and thus adopted and become the business's own statements. *United States v. Mitchell*, 49 F.3d 769, 778 (D.C.Cir.1995). That did not happen here. The complaints were inadmissible hearsay interleaved with admissible business records. Another erroneous ruling by the district judge was admitting into evidence a diary kept by an employee of one of the contractors; it was not the contractor's business record.

■ One of the complaints to the Board of Ethics was admitted into evidence on the additional ground that it was a "present sense" impression. Fed. R. Evid. 803(1). A person writing a report of a contemporaneous event has less time to forget what actually happened or to edit or

revise his report of it. Advisory Committee Note to Fed. R. Evid. 803(1); *United States v. Parker*, 936 F.2d 950, 954 (7th Cir.1991); *United States v. Brewer*, 36 F.3d 266, 271–72 (2d Cir.1994). That makes the report a reliable form of hearsay and so admissible. But in this case the so-called "present sense" impression was contained in a handwritten note added to a typed draft. The draft was contemporaneous but the handwritten note, which is what contained the incriminating material, appears to have been an afterthought. Moreover, the typewritten draft was the third in a series of very similar complaints, suggesting that Errera had been mulling over Santos's conduct for some time and that the handwritten note may have been intended as a reflective summary and characterization of that conduct rather than a spontaneous reaction to an immediate sensation. Only when the statement is made in circumstances, not present here, in which the declarant had little chance to revise his initial reaction is it admissible. E.g., *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir.1995).

The complaints, like another bit of challenged evidence—a "suspicious activity report" composed by one of the contractors—were admissible to show that the contractors thought they were being threatened, though not to prove that their suspicions were accurate. The judge gave an instruction to the jury properly limiting the use the jury could make of the suspicious activity report and one of the complaints, but he did not limit the jury's use of the other two complaints.

One of the employees of the Treasurer's office who testified against Santos was Laurie Dittman. Dittman is a lesbian, and Santos's lawyer wanted to establish through cross-examination that Dittman was hostile to Santos because Santos had broken up Dittman's relationship with Dittman's female lover by firing the latter (Santos's former campaign manager) and because the gubernatorial candidate on the same ticket with Santos held anti-gay positions. The district judge refused to permit these subjects to be raised in cross-examination. Obviously he would have permitted this if Dittman were heterosexual. Homosexuality is stigmatized by many Americans, however, and in deciding questions of admissibility a judge is permitted to consider a witness's interest in being shielded from embarrassment, though he cannot give it so much weight that it may change the outcome of the trial. See Fed. R.Evid. 611(a)(3) and Advisory Committee Note thereto; *United States v. Scroggins*, 939 F.2d 416, 420–21 (7th Cir.1991). The judge can also exclude such evidence under Fed.R.Evid. 403 if he reasonably concludes that it is much more likely to distract than to enlighten the jurors, or to make the jury irrationally doubt the witness's truthfulness.

The interest in protecting witnesses from gratuitous embarrassment can have no weight in the present case, because Dittman is openly lesbian and a lesbian activist to boot. See, e.g., Andrew Herrmann, "Gays Taking to Streets for Respect, Recognition," *Chicago Sun–Times*, April 19, 1993, p. 6 (identifying Laurie Dittman as executive director of "IMPACT, a statewide gay and lesbian political action committee"). The Rule 403 question is closer, but what tells decisively against the judge's ruling is that the government contended that Dittman's *only* motive in testifying against Santos was disgust at Santos's criminal behavior. Once again the judge allowed contested testimony adverse to the defendant to be presented while precluding the defendant from offering contrary evidence. It is true that the government offered to permit Santos's lawyer to cross-examine Dittman about whether she had a grudge against Santos because the latter had fired the campaign manager whom Dittman had recruited. But a grudge arising from the firing of an employee whom one had recruited is a far less plausible basis for inferring perjury than a grudge arising from the breaking up of one's marriage or an equivalent relationship.

■ Each of the errors that we have identified if taken in isolation may have been (though this we need not decide) harmless in the sense, which is the relevant sense, of being unlikely to have made a difference to the outcome. E.g., *United States v. Caputo*, 978 F.2d 972, 974 (7th Cir.1992). But in assessing whether a conviction should be upheld despite the presence of error, a court is required to assess the harm done by the errors considered in the aggregate. E.g., *United States v. Rivera*, 900 F.2d 1462, 1470–71 (10th Cir.1990) (en banc); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996). We have even said that "the cumulative effect of trial errors may deprive a defendant of his constitutional right to a fair trial." *United States v. Rogers*, 89 F.3d 1326, 1338 (7th Cir.1996); to the same effect see, e.g., *United States v. Copple*, 24 F.3d 535, 547 n. 17 (3d Cir.1994); *United States v. Sepulveda*, 15 F.3d 1161, 1195–96 (1st Cir. 1993). (There appears to be no practical difference between the two approaches, at least when a federal conviction is being reviewed on direct appeal, and indeed they are treated as interchangeable in *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir.1998).) Although the evidence against Santos was considerable, the case was not so completely one-sided against her that we can call the veritable avalanche of errors that we have identified harmless. The jury acquitted Santos of about half the counts in the indictment and might have acquitted her of some or even all of the rest had the trial judge not committed the litany of errors that we have enumerated.

■ And if all this is not enough, the judge committed another serious error though the prejudice from it is impossible to estimate. The direct examination of Santos was completed late in the afternoon of one of the trial days, and her cross-examination was scheduled to take place (and did) the next morning. The judge told Santos's lawyer that the substance of his client's testimony "should not be the subject of further inquiry with counsel" during the overnight recess, though "this does not mean to say you cannot converse with your client regarding strategy, the calling of witnesses, and so on," and he added that the lawyer should reread *Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), and "if I am in error, go along with the Supreme Court." (He didn't actually name *Perry*, but described the case he had in mind with sufficient particularity to point the lawyer to that decision.)

■ *Perry*, see *id.* at 284–85, 109 S.Ct. 594, along with *Geders v. United States*, 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), holds that a flat prohibition against a criminal defendant's conferring with his lawyer during an overnight or otherwise substantial recess violates the Sixth Amendment. The prohibition here was not flat, but (leaving aside for a moment the significance of the judge's reference to *Perry*) it went further than the law permits, by forbidding any discussion of the witness's testimony. *Perry* makes clear, as do the cases before and after it (though some of the "before" cases go too far, by forbidding *any* limit on discussions between lawyer and client), that while the judge may instruct the lawyer not to coach his client, he may not forbid all "consideration of the defendant's ongoing testimony" during a substantial recess, 488 U.S. at 284, 109 S.Ct. 594, since that would as a practical matter preclude the assistance of counsel across a range of legitimate legal and tactical questions, such as warning the defendant not to mention excluded evidence. See, e.g., *Mudd v. United States*, 798 F.2d 1509, 1512 (D.C. Cir.1986); *United States v. Cobb*, 905 F.2d 784, 792 (4th Cir.1990).

■ We do not think that the judge's telling counsel to read *Perry* and follow it if it was inconsistent with what he had just told counsel (it was) saved the day. Had the judge given the lawyer an opportunity to read *Perry* and advise the judge of his interpretation of it, the lawyer could have gotten the judge to modify the instruction. The judge *did not* give him that opportunity, which meant that if the lawyer dis-

cussed Santos's testimony with her in accordance with the lawyer's understanding rather than the judge's recollection of *Perry,* and later the judge rejected that interpretation, the lawyer would be inviting the judge's wrath, and possibly even courting sanctions for contempt of court, in disobeying the judge's instruction. The judge put him in an impossible position.

 Violations of the rule against flatly prohibiting consultation between a criminal defendant and his lawyer during a substantial recess are treated as complete denials of counsel (even though they are of limited duration), and so require reversal even if no prejudice is shown. E.g., *Perry v. Leeke, supra,* 488 U.S. at 280, 109 S.Ct. 594; *United States v. McLaughlin,* 164 F.3d 1, 4(D.C. Cir.1998); *Jones v. Vacco,* 126 F.3d 408, 416 (2d Cir.1997). We need not decide whether this approach, which is in some tension with the narrowing of the scope of automatic reversal in recent decisions by the Supreme Court, is applicable to the rather muddier violation that occurred here. The lawyer was not flatly prohibited from conferring with his client or even (because of the judge's incorporation by reference, as it were, of *Perry v. Leeke*) from discussing her testimony, but was given confusing marching orders that may well have inhibited the exercise of Sixth Amendment rights. The result may have been to hurt Santos in a critical phase of the case, namely her cross-examination, though no effort to prove this has been, or in the nature of things could readily be, made. But the prejudicial weight of this error is unimportant, for there is enough other prejudice to require us to reverse the judgment and order a retrial. We trust that the prosecutor's improper reference in his closing argument to an alleged fact that was not in evidence (that Santos must have known about John Henry's receipt of campaign contributions for her attorney to have known to ask him about them) will not be repeated at the retrial. Finally, Circuit Rule 36 shall apply on remand.

Reversed and Remanded.