Unifund CCR Partners v. Bonfigli, No. S1295-08 CnC (Toor, J., May 5, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
CHITTENDEN COUNTY

| | |
|---|---|
| UNIFUND CCR PARTNERS<br>  Plaintiff<br><br>  v.<br><br>ANDREW V. BONFIGLI<br>  Defendant | SUPERIOR COURT<br>Docket No. S1295-08 CnC |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This is a collections case in which plaintiff Unifund seeks to recover roughly $20,000 in past due credit card charges. A merits hearing was held on November 23, 2009. Plaintiff was represented by Alan Bjerke, Esq.; Defendant was represented by Drew Palscik, Esq. Post-trial memoranda were complete December 15.

Findings of Fact

The witnesses at trial were Bobby Carnes, a custodian of records for Unifund, and Mr. Bonfigli. Based upon the evidence presented, the court finds the following facts established by a preponderance of the evidence.

Unifund buys distressed credit card debt from various banks, when the accounts have been in default and have been "charged off" for tax reasons. Unifund buys the accounts in large portfolios. In this case, the accounts purchased were from Chase Bank USA. They were purchased pursuant to a bill of sale admitted in evidence as Exhibit 1. That bill of sale states that it "assigns" to Unifund "effective as of the File Creation Date of December 12, 2007 all rights, title and interest of [Chase] in and to those certain

receivables, judgments or evidences of debt described in Exhibit 1 attached hereto[.]"[1] The date of the document is unclear. It references a Credit Card Purchase Agreement between the parties dated April 1, 2007, and states that payment shall be made on January 3, 2008, yet the signatures of the parties are dated September 9, 2008 – eight months later.[2]

When Unifund makes these mass purchases from Chase, it receives a disc that is uploaded into its own electronic record-keeping system. The Exhibit 1 referred to in the Bill of Sale would have been such a disc. Pages 002-004, which contain the spreadsheet data on Bonfigli, is an excerpt of what would be in such a disc – along with the same data for all the other cardholders whose accounts were being assigned to Unifund but have been redacted from the exhibit.

Page 002 lists Bonfigli's name, account number, a balance of $20,373.14, a "contract date" and an address. Page 003 lists a town, zip code, home and work phone numbers, Bonfigli's social security number (which was blacked out before the record was admitted in evidence, pursuant to court rules), a charge-off date of April 2006, and a last payment date of September 2005. Page 004 lists something identified as "LPmtAmt", and "officer code," an "attorney code," a purchase balance of $15,719.04, and interest and fees of $4,654.10.

Page 005 of Court Exhibit 1 is an assignment from Unifund Portfolio A, LLC to Unifund CCR Partners (the plaintiff here). It assigns "all of Assignor's rights in the Receivables, for collection purposes only, including conducting litigation in Assignee's name, for those Receivables which Assignor owns or may acquire from time to time,"

---

[1] Thus, confusingly, we have reference to an Exhibit 1 to Exhibit 1.

[2] Bonfigli, however, has raised no issue regarding the validity of the assignment.

although Assignor "retain[s] title and ownership" of the receivables. The assignment is signed by the same person on behalf of both companies, and is undated.

Pages 006 through 0037 of Court Exhibit 1 consist of credit card statements for an account in Bonfigli's name. According to Carnes, the card account statements appearing at pages 006 to 0037 of Exhibit 1 would have been electronically generated by Chase and mailed out each month. While Mr. Carnes is not a Chase employee, he testified that he "is familiar with" how the Chase records are generated. He also testified that pursuant to federal laws there are "severe consequences" for businesses such as Unifund if they try to collect "bogus debt."

Exhibit 2 is a standard cardholder agreement. Chase gives Unifund the cardholder agreements when Unifund buys the portfolios, and Unifund then codes the portfolios so they know which agreement applies to which debt. Exhibit 2 reflects a 1994 date. Bonfiglio's account was opened in September 1999 and charged off in April 2006. Carnes testified that he knows Exhibit 2 was the agreement in effect during that period "because it's what Chase gave us." The agreement in question provides for an award of attorney's fees. The actual applications for credit cards are only kept for seven years, so no such application came to Unifund with Bonfigli's account records from Chase.

Unifund's claims as to the amounts due in this case are based upon the information that came to Unifund on the disc from Chase, the relevant parts of which appear on pages 002-004 of Court Exhibit 1. The disc was not itself offered in evidence. The actual charges on the account statements that Chase sent involved calculations of interest based upon changes in the prime rate from month to month. This is based upon terms of the Cardmember Agreement that describes how the Periodic Rate and the

3

Average daily Balance are calculated. *See* Exhibit 2. Unifund relies upon Chase to have accurately recorded all transactions on the account and to have calculated the interest correctly.

The court does not find Carnes qualified to testify about Chase's business practices. There was no evidence that he was ever employed by Chase or that he had personal knowledge of Chase's internal business practices.

Mr. Bonfigli acknowledges that he has had numerous credit cards over the years, and that he could have had a Chase card. He does not recall any specific account numbers. He testified that he does not know whether this Chase account was one of his or not, but in his answers to interrogatories he conceded that it was. He had automatic payments made to his accounts though his accountant. The accountant received the monthly statements. Bonfigli rarely saw them. He believes he had about seventeen credit cards.[3] He recalls disputing charges on some accounts over the years. He does not recall whether any of those disputes involved this account.

Exhibit 3 contains account statements produced by Bonfigli in discovery.[4] They are for the same account number on which Unifund's claim is based. The address appearing in some of the statements is Bonfigli's business address. The court finds that this account was in fact one of the accounts Bonfigli used for his business.

Exhibit 4 is an affidavit in support of Plaintiff's attorney fee request. Plaintiff seeks $850 in attorney's fees. Plaintiff also seeks prejudgment interest, calculated from

---

[3] Although it was never expressly explained, it appears that these were business accounts, not personal accounts.

[4] Unifund did not formally prove that the exhibit was produced in discovery by Bonfigli, which would have been the better course. However, counsel for Unifund represented that in court during a discussion about its admissibility, and counsel for Bonfigli did not challenge the representation. The court therefore takes counsel's representation to be true.

4

the date of charge-off to the date of the trial as $8,721.54, plus costs of $250 for the filing fee and $56.27 in sheriff's service fees.

## Conclusions of Law

The complaint in this case asserts two causes of action. The first is for breach of contract. The second is for unjust enrichment.

### I. Breach of Contract

#### a. Statute of Limitations

Bonfigli raised a number of defenses to Unifund's claims. First, he argued at trial that if the card-member agreement is the contract here, then Delaware law applies, and carries a three-year statute of limitations. Because the date of default was September 18, 2005 and this case was filed September 30, 2008, it would be beyond that three-year period. However, Bonfigli failed to raise this issue in his post-trial memorandum, and has provided the court with no citations to the alleged Delaware statute of limitations or any authority for the proposition that it would control in a case filed in Vermont. Thus, the court considers the argument waived.[5]

#### b. Admissibility of Records

Bonfigli also argues that Exhibits 1 and 2 – the data provided by Chase on a disc, and the Cardholder Agreement – were not adequately authenticated by a custodian of the original records from Chase. Under the rules of evidence, admission of a document as a business record requires (1) that it be "made at or near the time" of the events in question, (2) that it be made "by, or from information transmitted by, a person with knowledge," (3) that it was kept in the course of regularly conducted business, and (4) that it was the

---

[5] Even if it were not waived, the court would rule for Unifund on this issue because, as Unifund pointed out at trial, "[w]hen a cause of action is brought in Vermont, Vermont law determines the accrual date and the limitations period." Marine Midland Bank v. Bicknell, 2004 VT 25, ¶ 7, 176 Vt. 389.

regular practice of the business to make the record. V.R.E. 803(6). In addition, all of this must be "shown by the testimony of the custodian or other qualified witness." Id.

Unifund in essence asks the court to admit, as Unifund's business records, records compiled by Chase Bank rather than by Unifund. The problem is that Unifund itself cannot satisfy the requirements of the business record rule. The data in the records was not compiled by Unifund at or near the time of the account transactions which it is offered to prove. Nor is Unifund a party with knowledge of the underlying transactions. The data regarding the charges and payments to the account here was not made by anyone at Unifund, Unifund had no knowledge of the underlying data at the time it was created, and the original collection of the data was not part of Unifund's business practices. Likewise, Unifund did not create, distribute or maintain the Cardholder Agreement records. While the current records are a part of Unifund's business records, and therefore meet the business record exception to the hearsay rule, the Chase data *incorporated in those records* is itself hearsay.

Generally, the business records exception to the hearsay rule requires that the record "be made at or near the time by, or from information transmitted by, *a person within the business* with first-hand knowledge." M. Graham, Vol. 3B Federal Practice and Procedure: Evidence § 7047 (Interim Edition, 2000) (emphasis added). Thus, "[i]f the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy [which underlies the business record exception] does not extend to the information itself…" Id. ("An illustration is the report of an ambulance driver incorporating information obtained from a bystander: the driver qualifies as acting in the regular course but the bystander does not."); Rowland v. American General

6

<u>Finance Inc.</u>, 340 F. 3d 187, 194-95 (4th Cir. 2003)(trial court erred in admitting complaint letter from customer as business record of recipient business); <u>United States v. Santos</u>, 201 F.3d 953, 963 (7th Cir. 2000) (the exception "is inapplicable to information received rather than prepared by the business," unless "verified by the business").

In other words, the handoff of a collection of data from Party A to Party B, without any foundation as to its admissibility while the records of Party A, does not make it somehow admissible as the records of Party B merely because it is now in Party B's business files. Thus, the underlying account data is not admissible merely because it is now part of a Unifund business record.

Unifund suggests, however, other reasons why the records should be admissible. First, Unifund suggests that the custodian of Unifund's record may also serve as the "qualified witness" for the purpose of establishing that the data constituted a business record of Chase before it was turned over to Unifund. This is essentially what Unifund attempted to establish with Carnes' testimony that he was "familiar with" Chase's business practices. He testified that their billing data was automatically generated by computer whenever a cardholder paid for something with his credit card. However, Carnes did not explain how he was so familiar with Chase's business practices, whether he had ever worked at Chase, whether he has ever sat down with Chase to watch how they entered the data, whether he had ever checked the reliability of the entries, and so forth. The court does not find his testimony reliable or credible with regard to Chase's business practices.

Second, Unifund argues that the Uniform Business Records as Evidence Act permits the court to consider the records. 12 V.S.A. § 1700. That statute provides:

> A record of an act, condition or event, shall, in so far as relevant, be competent evince if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such to justify its admission.

Id. § 1700(b). It goes on to say that it "shall be so interpreted and construed as to effectuate the general purpose to make uniform the law of those states which enact it." Id. § 1700(c). The statute predates the adoption of the Vermont Rules of Evidence, and does not appear to have been cited since the time the Rules were adopted. *See* id., History (Source: V.S. 1947); V.R.E. 1102 (effective date of rules April 1, 1983). To the extent that it has any relevance, it is only to suggest that courts consider the interpretations of other states when addressing business records.

Unifund argues that the statute has been interpreted as essentially allowing the admission of records unless they lack credibility. *See* Westinghouse Electric v. B.L. Allen, 138 Vt. 84, 99 (1980). Unifund also points to a Vermont case permitting authentication by a custodian of records who does not have direct knowledge of the underlying transactions. *See*, State v. Burclaff, 138 Vt. 461, 467-68 (1980). Finally, Unifund argues that other states, in addressing the debt-purchasing industry, have found admissible records such as those at issue here. *See, e.g.*, Krawczyk v. Centurion Capital Corp., 2009 WL 395458 (N.D.Ill. 2009).

The Westinghouse case addressed the admissibility of a computer printout compiled from computerized account records, as distinct from account records maintained on paper. The court held that "[i]f the entries into the computer data bank were made in the regular course of business, the printout should not be excluded because

8

it was made after the underlying events .… Such a printout is as much a business record as would be a page from a ledger book bearing the same information." 138 Vt. at 100 (internal citation omitted). It also held that "where a foundation witness is unfamiliar with the physical operation of the computerized information storage and computation process, but has a general understanding of the accounting procedures involved and personal familiarity with the account, the admissibility of the printout statement of account should be admitted into evidence unless there are other factors which seriously compromise the trustworthiness of the computer printout." Id. at 101.

The Burclaff case similarly made clear that records may be admitted without the testimony of the person who entered the data, as long as "the record is verified by a witness who can testify that records of this type have been regularly prepared by the business under a routine that warrants reliability, and that the particular record sought to be admitted is of that class." 138 Vt. at 467.

Although both of these cases establish that the underlying entry-maker need not testify, they do not eliminate the requirement that the underlying entries be made in the ordinary course of business by someone who did have direct knowledge of the events recorded. In Burclaff the Court noted that "evidence that it was someone's business duty within the organization's routine to observe the matter recorded will usually suffice to establish that the record is based on actual knowledge." Id. The Court in Westinghouse also noted:

> In order for a document to be admitted as a business record a qualified witness must testify pursuant to 12 V.S.A. s 1700(b). The qualification of the witness and the sufficiency of his testimony are to be determined by the trial court in the exercise of its discretion in light of the

> sources of information, and the method and time of its
> preparation.

Id. at 99.

The question here is not whether a printout from computerized records can be a business record, or even whether records generated from a computer disc are *per se* problematic. The question, instead, is whether the witness in this case was able to provide a sufficient foundation for the admissibility of the underlying data on the disc provided to Unifund by Chase.

There is obviously a business practice in the industry to purchase large numbers of delinquent accounts as a block, and it makes sense as a practical matter that the seller and buyer of those accounts would agree to transfer records by electronic rather than paper means. It is equally understandable that many businesses in this day and age may choose to stop keeping paper records of all business transactions, and maintain only electronic versions. *See, e.g.*, Westinghouse, 138 Vt. at 98 ("computer stored and compiled data has become commonplace in the business community"). The question is what level of foundation is needed, and from whom, to support the admissibility of data from those electronic files.

Both parties point to cases from other jurisdictions in support of their positions. Bonfigli points to other cases involving debt-purchasing companies such as Unifund, in which similar attempts to admit the original creditors' records were rejected. For example, in a case similar to this one in which the plaintiff debt consolidator sought to establish the underlying debt to Citibank, the court rejected testimony similar to that of Carnes in this case. The court declared: "Clearly, Mr. Fabacher has no personal knowledge of the retail charge account agreement between the Defendant and Citibank."

10

<u>Rushmore Recoveries X, LLC v. Skolnick</u>, 841 N.Y.S.2d 823 (N.Y.Dist.Ct. 2007)(Table; text at 2007 WL 1501643 * 3). "The statements of Mr. Fabacher, who merely obtained the records from another entity that actually generated them, was an insufficient foundation for their introduction into evidence." <u>Id</u>. *See also,* <u>C &W Asset Acquisition, LLC v. Somogyi</u>, 136 S.W. 3d 134, 140 (Mo. App. S.D., 2004) (rejecting the argument that "a litigant [can] be the 'custodian' of another entity's records"); <u>Martinez v. Midland Credit Management, Inc</u>., 250 S.W. 3d 481, 485 (Tex. Ct. App. 2008)("Documents received from another entity are not admissible under rule 803(6), if the witness is not qualified to testify about the entity's record keeping.").

The same issue has arisen in other contexts. For example, a travel agent attempted to admit records showing that MasterCard had refunded money to a client of the agency. The court rejected the travel agent's affidavit, noting that the witness from the travel agency "could not lay the proper foundation for the admission of the documents because he was not a qualified witness to testify about the record keeping of another entity." <u>Powell v. Vavro, McDonald & Associates, LLC</u>, 136 S.W.3d 762, 765 (Tex. App., Dallas 2004).

Unifund, on the other hand, cites cases in which courts have admitted evidence similar to that at issue here. A number of those cases reason that if one business incorporates another's records into their own, and relies upon them for its transaction of business, they are reliable and thus admissible as the second company's business records. For example, in <u>Krawczyk v. Centurion Capital Corp</u>., the court found records almost identical to those offered here admissible because of the debt-purchaser's reliance upon the records it obtained from Capital One. The court declared:

11

> Centurion integrated the Capital One records into its own records and relied upon them in its daily operations. Centurion relied upon the information provided by Capital One when attempting to collect on Plaintiff's defaulted debt. Centurion, as a debt collector, was aware of the penalties for attempting to collect bogus debts; therefore, its reliance on the records provides another assurance of reliability.

2009 WL 395458, * 5. Unifund also cites numerous other cases that admit records of one company that have been incorporated into the records of another company and relied upon by the latter. *See, e.g*., Bell v. State, 176 S.W. 3d 90 (Tex. App. 2004).

This court does not quarrel with the general idea that records adopted by a business, though created by another business, may become the business records of the second entity. "Business records that have been created by one entity, but which have become another entity's primary record of the underlying transaction may be admissible pursuant to rule 803(6)." Martinez, 250 S.W.2d at 485. However, something more is required than merely saying "we got it from them so it must be true." There must be some assurance that the underlying records were reliable to begin with. *See, e.g*., Bell, 176 S.W. 3d at 92 (requiring, in addition to incorporation and reliance, that "the circumstances otherwise indicate the trustworthiness of the document."). This is the caveat in the business record exception to the hearsay rule, which allows admission of records with an otherwise proper foundation "unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness." V.R.E. 803(5).

"A document can comprise the records of another business if the second business determines the accuracy of the information generated by the first business." Cockrell v. Republic Mortgage Ins. Co., 817 S.W.2d 106, 112 (Tex. App. – Dallas, 1991). *See also*, Duncan Development, Inc. v. Haney, 250 S.W. 2d 811, 813 (Tex. 1982) (party offering

12

records of subcontractors "utilized a reliable method of confirming the accuracy of the submitted invoices"). The problem here is that there is no evidence of any such verification by Unifund.

Unifund suggests that because it relies upon the records for its business, they must be reliable. This might be sufficient in some businesses. For example, if one company purchased another's accounts for supplying a product, and took over delivery of the pre-ordered products, the acceptance of the deliveries by the clients would be a check on the reliability of the order records. Likewise, if a dentist took on another dentist's practice, and patients continued to show up when sent notices of regular check-ups, the reliability of the records would thereby be established. The ease with which inaccuracies in the records could be discovered also would make the likelihood of a fraudulent sale of such assets slim.

Here, however, given the nature of Unifund's business, the court does not find incorporation of the records sufficient to establish their reliability. The fact that Unifund relies upon such records to try to collect money does not establish that the amounts it seeks to collect are accurate, or that the debts are even still owed. Particularly given the practical reality that many collection cases based upon claims of credit card debt are resolved by default, without any appearance by the defendant, it is impossible to know how accurate many of these claims are. It is also not uncommon for defendants in debt collection cases to assert that they paid off the debt long ago, or have no knowledge of the credit card in question. It is certainly possible that some number of default judgments in these cases are being obtained based upon inaccurate information. The mere fact that Chase gives Unifund a disc does not provide any guarantees of the trustworthiness of the

data on that disc, absent some evidence about how and when the data on the disc was collected, organized and relied upon by Chase.[6] *Accord*, Riddle v. Unifund CCR Partners, 298 S.W.3d 780, 783 (Tex. App. 2009) (ruling that "[d]ocuments received from another entity are not admissible under Rule 803(6) if the witness is not qualified to testify about the entity's record keeping," and finding that records of original creditor were not admissible as business records of the subsequent purchaser -- a Unifund entity as in this case).

Moreover, although Unifund argues that the potential penalties for seeking to collect debts that are not accurate can be severe, no evidence was presented that such penalties are ever imposed, that any enforcement of the laws regarding such penalties actually occurs, or that it is in any other way a true danger to Unifund.

In sum, the court concludes that there is not a sufficient independent foundation for the admissibility of records based solely upon the disc received by Unifund from Chase, and the testimony of a Unifund employee.

If this were all that Unifund relied upon, the court would enter judgment for Bonfigli. However, Unifund has also offered in evidence Chase account statements that were produced by Bonfigli in discovery. Exhibit 3. Those statements reflect a total balance due as of May 2006 of $20,373.14 – the precise figure that appears as the amount due in Exhibit 1, the disc-generated data. Because of that corroboration through Bonfigli's own copies of the billing records he received,[7] the court finds that the

---

[6] At least one court has suggested that judicial notice of banking practices might justify admission of records without the usual foundation testimony. Federal Deposit Insurance Corp. v. Staudinger, 797 F. 2d 908, 910 (10th Cir. 1986). This court does not believe that it has sufficient familiarity with the technicalities of banking practices, or those of credit card companies, to rely on such judicial notice.

[7] Bonfigli did not present any evidence to challenge the charges appearing on those statements.

reliability of Exhibit 1 is sufficiently established. The records having been incorporated into Unifund's records and relied upon by the company in the ordinary course of its business,  the court finds the other elements of the business records rule to be established. The records are therefore admissible.

c. Existence of a Contract

Bonfigli argues that there is insufficient proof that the Cardholder Agreement admitted as Exhibit 2 contains the terms of the contract between the parties. The court agrees. The document has no signature by Bonfigli, and no other form reflecting his signature has been presented. The only testimony regarding the form agreement was from Mr. Carnes. He testified that this is the form agreement Chase used during the relevant period for all Visa accounts. However, the court finds his testimony regarding Chase's business practices unreliable, as he is not a Chase employee and did not otherwise establish his qualifications to testify about Chase's past business practices.

Despite the lack of a written agreement, however, the records of the account reflect that Bonfigli made payments to the account over a number of years. Exhibit 3. Unifund argues that by doing so, Bonfigli acknowledged the debt. Putnam v. Swain, 102 Vt. 90, 93 (1929). The Putnam case holds that partial payment on a debt constitutes acknowledgment of the debt. Although that case addressed only the issue of whether a debt was renewed for statute of limitations purposes, the same analysis seems applicable here.  Bonfigli paid portions of the debt through September of 2005, at which time the balance due was $16,668.43. The statements towards which he paid expressly stated the terms of interest (29.49%) and the over-limit fees. Thus, the court concludes that by making payments towards the account he acknowledged a contract by which the balance

15

was due for credit extended, as well as over-limit fees and the interest rate upon unpaid amounts.

However, the late fees did not appear on the statements until after the last payment was made. Thus, the court will not award any late fees (which total $273). Because the balance now due is the same debt with interest and fees added, but no additional charges, the court finds that Unifund may recover the $20,373.14, minus $273, for breach of contract by Bonfigli.

## II. Unjust Enrichment

Bonfigli argued at the close of the trial that under an unjust enrichment theory, Unifund should recover only what it paid to purchase his account rather than the larger amount sought here. Unifund responded that it is not the detriment to the Plaintiff that matters but the benefit to the Defendant. Bonfigli has not addressed this claim in its post-trial memorandum, and the court therefore considers the claim waived.[8] However, because the court finds a contract established, the claim for unjust enrichment is moot.

## III. Attorney's Fees

The source for Unifund's claim of attorney's fees is the Cardholder Agreement which the court has found does not establish the contract between the parties. Thus, there is no basis for an award of fees.

## Order

The court will enter judgment for Unifund, without attorney's fees and without late fees of $273. Unifund is directed to submit a proposed judgment consistent with this

---

[8] As with the other waived argument, the court concludes that Bonfigli's argument would fail even had it not been waived. "Unjust enrichment focuses on the value of the benefit actually conferred upon the defendant." D.J. Painting, Inc. v. Baraw Enterprises, 172 Vt. 239, 242 n. 2 (2001), quoting In re Estate of Elliott, 149 Vt. 248, 253 n. 2 (1988).

ruling within ten days, to which Bonfigli shall have five days to object pursuant to V.R.C.P. 58(d).

Dated at Burlington this 5th day of May, 2010.

_____
Helen M. Toor
Superior Court Judge