In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3345

United States of America,

Plaintiff-Appellee,

v.

Santa Chiappetta,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 847--William T. Hart, Judge.

Argued October 26, 2001--Decided May 10, 2002


   Before Posner, Manion, and Diane P. Wood,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  Santa
Chiappetta filed this appeal after being
found guilty of eight counts of mail
fraud, five counts of wire fraud, and two
counts of money laundering. For those
crimes, she received a sentence of 97
months' imprisonment as well as the
obligation to pay $1,881,669 in
restitution. On appeal, she rests her
hopes of reversal solely on the argument
that the district court abused its
discretion when it denied her a
continuance. Finding no such abuse, we
affirm.

I

   The underlying crimes for which
Chiappetta was convicted involved
financial scams. She presented herself to
potential investors as a successful
businesswoman, falsely telling them that
she manufactured and marketed handbags
and sports bags for well-known events and
shows like the Atlanta Olympic games and
Baywatch. She also told investors--again
falsely--that she had contracts and
orders to supply products to large
department stores, including Sears, J.C.
Penney's, Osco, Walgreen's, Target,
Walmart, and K-Mart.

Her goal was to convince the hapless investors to turn their money over to her, as advance payments for the production of these products--investments that she alleged would be repaid handsomely to them over time. In order to persuade them, Chiappetta misrepresented the nature and strength of her businesses, leading the investors to believe that they were helping to further contracts held by successful companies she owned and controlled, Fino, Inc. and Chill International. Chiappetta must have been convincing, because she ended up with over a million dollars of the investors' money. She used those funds in a variety of ways (none too original): some she spent on lavish personal items, including a new boat, two BMWs, trips to a resort in Lake Geneva, Wisconsin, and tickets to theater, concert, and sporting events; other funds went to pay back early investors who had sued Chiappetta, or were pressuring her for repayment.

Eventually, law enforcement authorities caught up with her and a grand jury returned a fifteen-count indictment against her. She was arraigned on November 24, 1999. Although the initial trial date was set for January 10, 2000, the trial was continued twice. The first continuance came about after the government moved under 18 U.S.C. sec. 4241 for a competency hearing. It did so after Chiappetta's psychiatrist, Dr. Yong Ha, presented the government with a letter stating that Chiappetta was not capable of understanding the charges against her. On the basis of the government's motion, and also because Chiappetta's attorney was recovering from surgery, the court granted the first motion for a continuance for trial and scheduled a competency hearing for March 1, 2000. At the competency hearing, Chiappetta withdrew the request that she be found incompetent to stand trial, but the government nevertheless offered evidence of her competency. The district court concluded that she was competent to stand trial and set the new trial date for April 3, 2000. On March 29, 2000, the parties appeared in court for a status hearing, at which time the court continued the trial for a second time (on its own motion) to address pretrial matters. The trial was rescheduled for May 1, 2000.

Sometime around April 24, 2000, Chiappetta's mother, Esther Chiappetta, was diagnosed with inoperable and terminal ovarian cancer. The doctor informed Chiappetta that her mother likely had only 8 to 12 weeks to live. On April 26, 2000, Chiappetta filed a motion for a third continuance, requesting that the court postpone the trial until her mental and emotional state improved and until she could arrange for assistance for her mother. The government opposed the motion, arguing that because its witnesses had already twice been through the inconvenience of arranging their schedules to appear for trial, it did not believe it was fair to reschedule them again. It noted that one witness was going out of town for two weeks and two witnesses were doctors, and so their ability to adjust their schedules on short notice was severely limited. The district court agreed with the government and denied the continuance. The judge did, however, take several measures designed to accommodate Chiappetta's unfortunate situation. He expressly told defense counsel to "keep [him] posted"; he changed the trial schedule to half days; and he told Chiappetta that he would consider "whatever else" would be helpful if particular problems arose during the course of the trial.

The case proceeded to trial on May 1, 2000, without any further comment from Chiappetta on her emotional state or her mother's health. At trial, Chiappetta was seen whispering and passing notes to her attorney; she provided documents, as well as names and contact information for potential defense witnesses. Notwithstanding these efforts, Chiappetta now argues that her lawyer, Robert Bailey, presented very little defense. Bailey did not decide upon or contact defense witnesses until the morning the government finished putting on its case, and he only presented four witnesses. He did not interview the witnesses prior to trial, nor did he explain to them the charges against Chiappetta, or thoroughly question them about their relationship with Chiappetta. Although Chiappetta's defense was that she was a legitimate businesswoman and that her business deals just went bad, he did not present documentary evidence that supported this version of the events.

At the trial's conclusion, the jury found Chiappetta guilty on all charges, and the court sustained two counts offorfeiture against her. The district court later denied Chiappetta's motion for a new trial and, as already noted, sentenced her to 97 months' imprisonment and ordered her to pay $1,881,669 in restitution.

II

Chiappetta argues that her conviction should be overturned and a new trial ordered because, in her agitated emotional state over her mother's decline, she was unable meaningfully to assist in her own trial. Specifically, she argues the district court's denial of a third continuance was an abuse of discretion that had the practical effect of preventing her from participating in her own defense. This, she claims, was a structural error that struck at the heart of her right to competent representation. The only remedy for this type of prejudice, she urges, is reversal, without regard to any particular prejudice she may have suffered. We will address her broader argument later. Initially, however, the immediate issue before us concerns only the denial of the continuance, which we review for abuse of discretion. United States v. Tingle, 183 F.3d 719, 723 (7th Cir. 1999). This is of course a deferential standard, see Morris v. Slappy, 461 U.S. 1, 11-12 (1983), and there must be a showing of actual prejudice to warrant reversal. United States v. Avery, 208 F.3d 597, 602 (7th Cir. 2000); United States v. Depoister, 116 F.3d 292, 294 (7th Cir. 1997). When evaluating whether a district court abused its discretion in denying a continuance, this court considers the "circumstances of the ruling and the reasons given by the judge for it." United States v. Santos, 201 F.3d 953, 958 (7th Cir. 2000).

The district court denied the continuance principally because the witnesses, who were also the victims of her scheme, would be unduly burdened by a third postponement. This was an appropriate factor for the court to take into account, although not the only one that bears on the decision. Other relevant factors include:

(1) the amount of time available for preparation, (2) the likelihood of prejudice from denial, (3) the defendant's role in shortening the effective preparation time, (4) the degree of complexity of the case, (5) the availability of discovery from the prosecution, (6) the likelihood the continuance would satisfy the movant's needs, and (7) the inconvenience to the court.

Avery, 208 F.3d at 602. Courts have also considered the age of the case; whether the government opposed the continuance; whether there would be a hardship on anyone; and the defendant's interest in being represented by the lawyer of her choice. Santos, 201 F.3d at 959.

The district judge, who was in the best position to consider Chiappetta's circumstances, see United States v. Schwensow, 151 F.3d 650, 656 (7th Cir. 1998), reasonably concluded that there was no need for a step as drastic as another continuance. This was not a particularly complex case, and Chiappetta is not asserting that the district court's denial of the motion limited discovery. Nor does she take issue with the court's finding that the government's witnesses would be sorely inconvenienced by a third continuance. At oral argument, her lawyer conceded that the district court attempted to be flexible and achieve a balance that would assist Chiappetta as well as the victims of her scheme.

It seems that Chiappetta's main point is that the denial of the continuance had the effect of interfering with her efforts to assist her trial counsel. But the district court was entitled to conclude that there were other ways to accommodate the unfortunate development of her mother's illness. It was rightly concerned about the nature of the postponement Chiappetta would have needed: an indefinite time period, until her mother's death. Although the doctors had told her that her mother had between 8 and 12 weeks to live (which as it happens turned out to be exactly right, as Esther Chiappetta actually died on July 1, 10 weeks after she was diagnosed with terminal cancer), such predictions are notoriously unreliable. The papers are filled with inspiring stories of

people who beat such odds, and it is equally true that a patient succumbs sooner than anticipated. In addition, the death of Chiappetta's mother would not necessarily have marked the end of her inability to assist her counsel. Indeed, under Chiappetta's argument, the district court would abuse its discretion any time it refused to grant a continuance when a traumatic event occurs. That is simply not the law; there is no rule that requires an indefinite continuance whenever a defendant is emotionally upset. See Morris, 461 U.S. at 14. Here, the district court struck a sensible middle ground: the half-day schedule it ordered allowed Chiappetta to spend the afternoons by her mother's side.

It is also important to note that her request for a continuance came quite late in the day. Chiappetta had already had several months to prepare for a May 1 trial date (from November until the end of April). Although Chiappetta complained that her counsel did not interview witnesses or introduce documents, that alleged problem had little or nothing to do with the denial of the third continuance. As we noted before, Chiappetta only learned of her mother's illness the week before trial. She does not explain the failure to prepare before that date. At oral argument, counsel conceded that there was a period where she and her attorney were able to communicate.

Chiappetta finally argues that the district court abused its discretion because of the effect of the ruling on her Sixth Amendment rights. In this respect, she asserts that her case is similar to Santos, supra. In Santos, this court held that the district court abused its discretion, considering all the circumstances, when it denied the defendant a continuance for a fixed period of time, which would have ensured that the lawyer of her choice would represent her. Chiappetta argues the district court similarly violated her Sixth Amendment rights by eliminating her right to assist in her own defense. This, she reasons, is the same as depriving her of the lawyer of her choice, or as depriving her of the effective assistance of counsel, and should be treated by this court as a "structural error"--that is, one subject to reversal without regard to

any particular showing of prejudice, because of the effect it has on the operation of the criminal justice system as a whole. See United States v. Neder, 527 U.S. 1, 7 (1999).

The Supreme Court has recognized constitutional error without any showing of prejudice if counsel is completely absent, or prevented from assisting at a critical point. United States v. Chronic, 466 U.S. 648, 659 n. 25 (1984). It is also possible to find a structural error where "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry in the actual conduct of the trial." Id. at 659-60 (citing Powell v. Alabama, 287 U.S. 45 (1932), as an example of such a case). Yet there are limitations to the application of this principle. See, e.g., Avery v. Alabama, 308 U.S. 444 (1940) (affirming trial court denial of defense counsel motion for additional time when counsel only had three days to prepare for trial). Indeed, this court has opined that the structural rule may be confined to complete denial of counsel or its equivalent. Santos, 201 F.3d at 960.

Chiappetta cites Pate v. Robinson, 383 U.S. 375 (1966), and Drope v. Missouri, 420 U.S. 162 (1975), in support of her structural error argument. In Pate and Drope, the Supreme Court held that a person who cannot assist in her own defense may not be tried. In keeping with that holding, this court has recognized a defendant's due process rights to assist in her own defense. See, e.g., Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996). Unfortunately for Chiappetta, she ignores the common link in all of these cases-- that all of these defendants were incompetent to stand trial. They were mentally or physically unable to understand the charges against them or assist counsel.

Chiappetta must do more than allege that she was emotionally upset during trial to come within the rule of Drope or Pate. "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather the evidence must indicate a present inability to assist

counsel or understand the charges." Eddmonds, 93 F.3d at 1314 (internal quotation omitted). Although Chiappetta argues that she was unable to assist her counsel, she does not tie this inability to legal incompetence. To the contrary, she withdrew the incompetency argument and never attempted to revive it between the time of the competency hearing on March 1, and April 24, when her mother was diagnosed. Even if we accept her contention that she was unable to communicate effectively and was distracted, those problems fall far short of legal incompetence. Chiappetta's structural argument also fails because she was able to assist in her defense. Although she was described as distraught over her mother's illness, she acted as other defendants do in trial, passing notes and making suggestions to her attorney. Chiappetta has not come close to identifying a structural error, and thus this argument does not undermine the district court's decision to deny the requested continuance.

III

Finally, we see no need to recharacterize Chiappetta's arguments as a backhanded complaint of ineffective assistance of counsel, as the government has done. The government urges that since ineffective assistance of counsel is an important theme of Chiappetta's appeal, and she may try to raise it later in a petition under 28 U.S.C. sec. 2255 for habeas corpus relief, this court should address it now. We discourage defendants from raising this argument on direct appeal, however, because the record normally is inadequate for a proper assessment of the claim. United States v. Gilliam, 255 F.3d 428, 437 (7th Cir. 2001). That is exactly the case here, and since Chiappetta herself has not raised the issue on direct appeal, we will not force it upon her.

For all these reasons, we therefore Affirm the judgment of the district court.