In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3033

KHUBEB VAHORA,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals.
A098-371-817

ARGUED APRIL 21, 2010—DECIDED NOVEMBER 15, 2010

Before CUDAHY, RIPPLE and HAMILTON, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Khubeb Vahora, a native and
citizen of India, sought asylum in the United States based
on his Muslim faith. The Immigration Judge ("IJ")
denied asylum and granted voluntary departure, and the
Board of Immigration Appeals ("BIA" or "Board") af-
firmed. Mr. Vahora now petitions for review of the
BIA's decision. He contends that the Board erred in

determining that he had not been subjected to past persecution and that he had not established a well-founded fear of future persecution. He also submits that the IJ did not fulfill the regulatory obligation to advise him of avenues of relief other than asylum and that his case should have been closed administratively and joined with a case involving his parents. For the reasons set forth in this opinion, we deny the petition for review.

## I

## BACKGROUND

### A.

In 2002, Mr. Vahora, then thirteen years old, lived with his grandparents in the Gujarat province of India while his parents were abroad. Although he attended school in Anand during much of this period, he was staying at his grandparents' home in Ahmedabad on March 2, 2002. That evening, Mr. Vahora heard loud noises coming from outside the home and chants urging the killing of Muslims. Muslim homes and businesses in Ahmedabad were being set on fire by a rioting Hindu crowd.[1] At his

---

[1] Secondary sources confirm the rioting. According to a Home Office Report cited by the IJ in Mr. Vahora's proceedings, an attack on a train carrying Hindu activists at the end of February 2002 left 58 dead and 43 injured and sparked retaliatory violence throughout Gujarat. "In the State capital, Ahmedabad, crowds looted and burned Muslim-owned shops,

(continued...)

grandfather's instruction, Mr. Vahora fled from the home through the back door. As he looked in one direction, Mr. Vahora saw a Muslim bakery burning. He ran from the mob that he described as carrying "burning wood," A.R. 116, and shortly came upon two Hindu men holding down a Muslim man while a third Hindu man stabbed him. Mr. Vahora recognized all of the perpetrators and the victim and could identify them by name. The Hindu men saw him standing there and spoke to him. He did not respond, but instead turned and ran while the men pursued him. He eventually came upon a rickshaw, which carried him to a temporary camp for fleeing Muslims. He learned later that his grandparents' home was among those that had been burned.

After he had spent two days in the camp, Mr. Vahora's grandparents located him. The family remained there for a few more days, then relocated to Anand. After

---

[1] (...continued)

hotels, restaurants, and petrol stations. In one incident, 38 Muslims were said to have burnt to death when a mob isolated and burnt down 6 bungalows." A.R. 157 (U.K. Home Office, Country of Origin Information Report, India, 2006). According to the report, by the 12th of March, violence had claimed some 700 lives and an estimated 100,000 Muslims were in relief camps. *Id.* The Home Office Report also cites a National Human Rights Commission report, not itself a part of the record, which apparently concluded that the government of India was at least tacitly complicit and guilty of a "comprehensive failure . . . to control the persistent violation of rights." *Id.*

several weeks, the family sent Mr. Vahora to Mumbai to live with an aunt and uncle, where he stayed for several months. He testified that his grandparents told him that the men involved in the attack he had witnessed inquired after him "quite often," and that the family interpreted their questions as threatening. A.R. 125; *see also id.* 124 ("[T]heir real meaning was they wanted, they were looking to kill me.").

After several months in Mumbai, Mr. Vahora's father returned and took Mr. Vahora with him to South Africa, where he had been living. After several months in South Africa, the family decided to travel to the United States. They returned to Mumbai and obtained visas. Mr. Vahora testified that, while in Mumbai, about a week before he left for the United States, he saw some suspicious-looking men standing outside a store where he was headed to buy milk. He hid in another store until they left, and, when he then entered the first store, the shop-keeper told him that the men had been asking about him. Mr. Vahora and his family left Mumbai for the United States in September 2003.

In the United States, Mr. Vahora's father apparently attempted to obtain a change of status to an employment-based non-immigrant visa, and Mr. Vahora started at-tending school. In 2005, when he was 16, Mr. Vahora was a passenger in a car driven by a friend who was speeding. The vehicle was stopped and, through a course of events not disclosed by the record, Mr. Vahora's lack of legal status in the United States was discovered by law enforcement. The Department of Homeland Security thereafter initiated removal proceedings against him.

**B.**

Because Mr. Vahora makes several claims in his petition for review that relate to the procedural history of his case before the IJ, we discuss that history in some detail.

On January 17, 2006, at Mr. Vahora's first substantive hearing, the IJ noted that Mr. Vahora was a minor with parents present in the United States, but was in removal proceedings alone. He inquired of counsel for Mr. Vahora and for the Government whether Mr. Vahora's parents had lawful status in the United States or were the subject of separate removal proceedings. Mr. Vahora's attorney indicated that, with the assistance of another attorney, the parents had submitted a request for change of status to an L non-immigrant visa. According to Mr. Vahora's attorney, the parents' initial application had been denied, but there was either an appeal or a motion to reopen pending, and no removal proceedings were currently pending against Mr. Vahora's parents. In response, the IJ asked the Government's attorney whether proceedings could be initiated against the parents—and joined with Mr. Vahora's—or whether Mr. Vahora's proceedings could be administratively closed until such time as a final decision on the parents' change-of-status application had been reached. The IJ noted that he hoped to "find a solution" that did not put him "in the position of having to order someone back to India when [his] parents are still here and their status is unadjudicated." A.R. 74. Counsel for the Government agreed to a continuance to permit an investigation of the status of the

parents' pending cases, but voiced the belief that it would be premature to close administratively Mr. Vahora's case. Government counsel further noted that, although he could not direct that proceedings be initiated against the parents, he would inquire of Immigration and Customs Enforcement whether they intended to do so. The IJ continued the hearing, and Mr. Vahora was directed to file his asylum application at his next court date.

On April 25, 2006, Mr. Vahora appeared for his continued hearing. At this hearing, he was represented by another attorney from the same law firm that had represented him at his initial appearance. When the IJ inquired about the asylum application due at the hearing, Mr. Vahora's attorney indicated that she was newly assigned to his case within the firm and had not prepared an application. According to new counsel, Mr. Vahora's previous representative had left the firm. She repeatedly stated Mr. Vahora's desire to make an application for asylum or withholding of removal, and she repeatedly sought a continuance. When the IJ told the attorney that he would not further continue the hearing and would only consider applications for relief that were ready to proceed, as previously ordered, Mr. Vahora's attorney requested that the IJ terminate proceedings on the basis of the parents' pending L non-immigrant visa application. Counsel for the Government did not agree to termination, stating that it was her "understanding that the Government is . . . placing the subject's father in removal proceedings." A.R. 84-85. Mr. Vahora's attorney then presented a copy of an on-

line case status update page showing the still-pending change-of-status application for his father, but the IJ nevertheless concluded that "[p]endency of the application for another alien [did] not provide for the status of" Mr. Vahora, and, therefore, there was no basis for termination. A.R. 85. With no other applications for relief pending, the IJ granted Mr. Vahora voluntary departure.

Represented by new counsel, Mr. Vahora appealed to the Board, seeking an opportunity to file an asylum application before the IJ. The Board agreed with Mr. Vahora that prior counsel had provided ineffective assistance by failing to comply with the court-ordered asylum application deadline and remanded for further proceedings.

On remand to the IJ, Mr. Vahora presented his application for asylum. In these post-remand proceedings, his counsel did not seek, or even mention, the possibility of termination or administrative closure. Indeed, at his final merits hearing, the Government noted that Mr. Vahora's parents were now in removal proceedings before another IJ, apparently with an asylum claim arising out of the same set of facts. The Government proposed joining Mr. Vahora's case with his father's, but the IJ declined, noting the independent procedural histories of the cases. Although the ruling already had been made, Mr. Vahora's own counsel then added, "[w]e would have objected to" any joining of the cases. "The father was not present at the time [Mr. Vahora] experienced his persecution." A.R. 108.

Mr. Vahora testified to the facts underlying his claim, which we already have set forth. When questioned about events subsequent to the riots, Mr. Vahora testified that, even after his departure and up to the time of his immigration hearing, his grandparents were approached by the men involved in the stabbing and their associates to inquire about him. He also stated that he could be located anywhere in India by members of the same political party as the Hindu men whose crime he had witnessed and that they "will just go to any, any length" to protect their associates. A.R. 129. Mr. Vahora noted that he had been found once in Mumbai, despite its size, and that he could not be safe from party members in any Indian city. He testified that while in India, he was "full of fear" and "remain[ed] inside the house and . . . didn't even go out." A.R. 129-30.

At the close of the hearing, the IJ denied relief. The IJ first concluded that, although his application was submitted beyond the one-year deadline, Mr. Vahora's youth and the ineffective assistance he received from former counsel constituted extraordinary circumstances sufficient to excuse his failure to comply with the deadline. *See* 8 U.S.C. § 1158(a)(2)(B) & (D). Turning to the merits of the claim, the IJ accepted as credible Mr. Vahora's testimony about the riots and his flight from his grandparents' home. Although he noted that Mr. Vahora's "contentions that Muslims were placed in fear of their lives" during the rioting were "well supported by the historical record," A.R. 57, the IJ concluded that the events in Mr. Vahora's particular case did not rise to the level of past persecution, relying in part on

an unpublished decision of this court.[2] The IJ also concluded that Mr. Vahora had not established that he faced well-founded fear of future persecution on a country-wide basis. Accordingly, the IJ denied all relief but voluntary departure.

Mr. Vahora appealed to the BIA. He principally contended that the IJ erred in his adjudication of the asylum claim. He further contended that the IJ had failed to advise him of other available avenues for relief from removal as required by 8 C.F.R. § 1240.11(a)(2) and that his proceedings should have been closed administratively or terminated because he was a minor in parental custody.[3]

The Board affirmed the denial of relief in a separate opinion. The Board specifically agreed with the IJ's conclusion that Mr. Vahora had demonstrated neither past persecution nor a well-founded fear of future persecution. The Board noted that, "[a]lthough the Indian Muslim respondent was caught up in a riot by Hindus in March 2002, and was threatened with harm after witnessing a stabbing, this incident does not compare to cases where the Seventh Circuit has clearly found past persecution." A.R. 3. Further, the Board concluded that

---

[2] *See* A.R. 56 (citing *Patel v. Gonzales*, 173 F. App'x 471 (7th Cir. 2006)).

[3] Mr. Vahora raised one other challenge also rejected by the Board, not pressed in his petition for review, namely, that as a minor in parental custody, he could not be held to his concession of removability before the IJ. *See* A.R. 4.

Mr. Vahora had failed to demonstrate that there was no reasonable possibility of safe relocation elsewhere in India. Finding no merit in Mr. Vahora's procedural challenges, the Board dismissed the appeal and extended the period of voluntary departure. Mr. Vahora now petitions for review.

## II

## DISCUSSION

Mr. Vahora raises both procedural and substantive challenges to the Board's order. First, he claims that the Board erred in its resolution of his asylum claim when it concluded that he had established neither past persecution nor a well-founded fear of future persecution. Next, he claims that the IJ erred in failing to close administratively his case at the outset, because he believes that, as a minor child in parental custody in the United States, his case should have been treated together with that of his parents. Finally, he claims that the IJ failed to properly advise him of the potential availability of adjustment of status through his father's employment-based visa and that the failure to do so requires reversal and remand. We address these contentions in turn.

We note, as an initial matter, that the Board issued its own decision dismissing Mr. Vahora's appeal. Although both parties suggest that the decision of the IJ and the BIA should be viewed together, our precedent does not support this position. We consistently have reaffirmed that a stand-alone opinion of the Board is our sole basis

for review, even if the Board's opinion agrees with specific conclusions of the IJ. *See, e.g.*, *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007). Our standard of review for legal questions is de novo; "[h]owever, we defer to the Board's factual findings, reversing the Board only if the record lacks substantial evidence to support its factual conclusions." *Mekhtiev v. Holder*, 559 F.3d 725, 729 (7th Cir. 2009). "Under the substantial evidence standard, the agency's determination will stand if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Raghunathan v. Holder*, 604 F.3d 371, 376 (7th Cir. 2010) (internal quotation marks omitted); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).[4]

---

[4] In *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), the Supreme Court noted that, under the substantial evidence standard, the Board's denial of asylum could only be reversed if the reviewing court determines that "the evidence presented . . . was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." The Court further explained:

Quite beside the point, therefore, is the dissent's assertion that "the record in this case is more than adequate to *support the conclusion* that this respondent's refusal [to join the guerrillas] was a form of expressive conduct that constituted the statement of a 'political opinion,'" *post*, at 488 (emphasis added). To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it—and also compels the further conclusion that Elias-Zacarias

(continued...)

**A.**

We first consider Mr. Vahora's asylum claim. Mr. Vahora contends that the Board erred in concluding that he had not been subjected to past persecution. Mr. Vahora's claim of past persecution centers on the events of the 2002 Gujarat riots. The Board concluded that Mr. Vahora's own experience in this period, in which he witnessed a stabbing and was threatened with harm thereafter as a witness, did "not compare to cases where the Seventh Circuit has clearly found past persecution." A.R. 3. In support of its conclusion that this harm did not rise to the level of persecution, the Board relied on cases involving egregious forms of persecution, including particularly severe beatings, torture and psychological torment.[5] We never have indicated, however, that these

---

[4] (...continued)

   had a well-founded fear that the guerrillas would persecute him *because of* that political opinion.

*Id.* at 481 n.1 (emphasis in original) (alteration in original).

At the conclusion of the opinion, the Court restated the petitioner's burden: "[I]f [the alien] seeks to obtain judicial reversal of the BIA's determination, he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution. That he has not done." *Id.* at 483-84.

[5] The Board's opinion cites *Tchemkou v. Gonzales*, 495 F.3d 785, 788-89 (7th Cir. 2007) (female petitioner seriously beaten, held in filthy communal and mixed-sex cell with no food, water or sanitation facilities for three days, causing numerous physical

(continued...)

types of incidents set a floor for conduct that meets the legal definition of persecution, and we do not do so here.

We have no intention to minimize a child's witnessing of a stabbing and other acts of violence committed against members of his own minority religious group. Nevertheless, under our precedent, the Board's conclusion that the harms Mr. Vahora personally suffered do not rise to the level of persecution is supported by substantial evidence. Mr. Vahora has not presented us with any factually analogous cases in which the petitioners were found to have suffered past persecution. Moreover, in circumstances similar to Mr. Vahora's, we have rejected such a claim. *See, e.g.*, *Ingmantoro v. Mukasey*, 550 F.3d 646, 649-50 (7th Cir. 2008) (rejecting claim by an ethnic Chinese Christian living in Indonesia as not demonstrating past persecution where petitioner's father's

---

[5] (...continued)
injuries; later was abducted, taken to the woods, where she was beaten and had a portion of her ear torn off; suffered additional subsequent beatings), *Soumahoro v. Gonzales*, 415 F.3d 732, 737 (7th Cir. 2005) (petitioner was "imprisoned for two weeks, during which time he was beaten regularly, denied adequate food and water, and had salt literally rubbed in his wounds"; he also was dismissed from his employment and one of his subordinates was murdered during a political demonstration in which they both participated), and *Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir. 2003) (petitioner beaten on several occasions by masked men; had his home broken into and his father beaten in his presence; forced, with his parents, to witness the rape of his wife).

store was burned by native Indonesian Muslim men looking for the petitioner, resulting in only bruises obtained while she ran from the scene); *see also Bhatt v. Reno*, 172 F.3d 978, 981-82 (7th Cir. 1999) (denying petition of Indian citizen after noting that he was beaten several times, had protestors in front of his store and received threats from individuals belonging to radical Hindu groups in retaliation for assistance he had provided to Muslims).

The Board's conclusions regarding Mr. Vahora's fear of future persecution also are supported by substantial evidence. The Board ruled that Mr. Vahora had not established that he faced a reasonable possibility of persecution on a country-wide basis, as required by the regulations. *See* 8 C.F.R. § 1208.13(b)(2)(ii). Before this court, Mr. Vahora presses his contention that, because, in his view, he had established past persecution, he need not demonstrate that he had a fear of future persecution on a country-wide basis. Although we agree with this statement of the law,[6] it does not aid Mr. Vahora because we already have concluded that the Board's determination that he had not suffered past persecution is supported by substantial evidence.

Mr. Vahora makes no significant effort to argue that, if the regulatory requirement applies in his case, reloca-

---

[6] *See Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008) (noting that applicants seeking to establish asylum eligibility on the basis of a well-founded fear of future persecution bear the additional burden of showing that internal relocation is not reasonable).

tion is unreasonable. At his hearing before the IJ, he testified that the Hindu men responsible for the stabbing and their political associates have inquired about his well-being from his grandparents in Gujarat and that, on one occasion, men asked a shopkeeper near his uncle's home in Mumbai about him. He also notes that his immediate family is still in the United States, that he is only twenty-two years old and that he has lived outside India for the last eight years. We cannot say that these circumstances, without more, demonstrate that he cannot relocate safely and reasonably in India. The Board's determination that he has not shown a well-founded fear of future persecution is, therefore, supported by substantial evidence and cannot be disturbed.

## B.

Mr. Vahora also challenges the IJ's refusal to close administratively his case so that it could be joined with his parents' case. The Government, relying on *Diaz-Covarrubias v. Mukasey*, 551 F.3d 1114, 1118 (9th Cir. 2009), responds that we lack jurisdiction to consider this question.

## 1.

We address the jurisdictional issue first. As both the First and Third Circuits have noted, "[a]dministrative closure is a procedural convenience that may be granted if both parties to the removal proceedings agree, but it does not constitute a final order. Rather, administrative

closure of a case *temporarily removes* a case from an immigration judge's calendar or from the Board's docket." *Arca-Pineda v. Attorney Gen.*, 527 F.3d 101, 104-05 (3d Cir. 2008) (alteration in original) (emphasis added) (internal quotation marks and citation omitted) (citing *Lopez-Reyes v. Gonzales*, 496 F.3d 20, 21 (1st Cir. 2007)). Once a case has been closed administratively, "either party can move to have the case recalendered" once circumstances "indicat[e] that the case is ready for a hearing." *Matter of Hashmi*, 24 I. & N. Dec. 785, 792 n.4 (BIA 2009). As the Sixth Circuit has noted, this temporary removal of the case from the docket is similar to a court's granting of a continuance, albeit an indefinite one. *Garza-Moreno v. Gonzales*, 489 F.3d 239, 242 (6th Cir. 2007) (calling the two processes "not distinguishable" in the jurisdictional inquiry).

Following the Supreme Court's decision in *Kucana v. Holder*, 130 S. Ct. 827, 839-40 (2010), it is clear that an immigration court's denial of an alien's request for a continuance is reviewable. The Court reached that conclusion by evaluating the jurisdictional bar found in 8 U.S.C. § 1252(a)(2)(B)(ii), which prohibits courts from reviewing any "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security," other than a decision on asylum. The Court specifically rejected the view that those decisions committed to agency discretion *by regulation*, rather than by statute, fall within the ambit of the jurisdictional bar. *Kucana*, 130 S. Ct. at 837-38.

The Government submits that the central holding of *Kucana* does not answer the jurisdictional question here. The Government notes that the Court specifically reserved judgment on whether a *separate* statutory provision, found in the Administrative Procedures Act ("APA"), prevents review of certain discretionary decisions of the agency not otherwise barred by the INA's own proscription. *See Kucana*, 130 S. Ct. at 839 n.18; 5 U.S.C. § 701(a)(2). The APA, which governs most aspects of review of agency action in the courts,[7] has no application, according to its provisions, where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Government urges us to adopt the view that administrative closure falls within this exception to judicial review, as two other courts of appeals have done. *See Ochoa v. Holder*, 604 F.3d 546, 549 (8th Cir. 2010); *Diaz-Covarrubias*, 551 F.3d at 1120.

To evaluate the Government's submission, we turn to the precedents interpreting § 701(a)(2). In *Heckler v. Chaney*, 470 U.S. 821 (1985), inmates sentenced to death challenged a decision by the Food and Drug Administration not to enforce a statute it administered in the context of lethal injections. The Court held that the relevant section of the APA, 5 U.S.C. § 701(a)(2),

---

[7] Several courts have acknowledged explicitly that the judicial review provisions of the Immigration and Nationality Act, *see* 8 U.S.C. § 1252, call for traditional review under the APA. *See, e.g.*, *Flores-Miramontes v. INS*, 212 F.3d 1133, 1140 (9th Cir. 2000); *Sandoval v. Reno*, 166 F.3d 225, 235 (3d Cir. 1999).

prevented review "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830. The Court noted at some length the historical tradition of considering such enforcement decisions to be wholly discretionary and concluded that the APA did not upset that tradition. Accordingly, the Court held that it could not review the FDA's inaction under the abuse of discretion standard provided by the APA.

Notably, the Court in *Heckler* stated that its recognition of agency discretion over enforcement was "attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement." *Id.* at 831. Since *Heckler*, the questions to which the Supreme Court has applied this rule have been of a similar character. In *Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993), the Court held that agency allocation of funds in a lump-sum appropriation was unreviewable. *Id.* at 192 ("After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."). The Court otherwise has "limited the exception to judicial review provided by 5 U.S.C. § 701(a)(2) to cases involving national security, such as *Webster v. Doe*[, 486 U.S. 592 (1988),] and *Department of Navy v. Egan*[, 484 U.S. 518 (1988),] or those seeking review of refusal to pursue enforcement actions." *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (Stevens, J., concurring) (citations omitted). Outside of these distinct, policy-based areas in which the courts "have long been hesitant to intrude," *id.*

at 819, the Court has found no basis for review only when it has concluded that there is effectively "'no law to apply'" to the question, *id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated in part on other grounds by Califano v. Sanders,* 430 U.S. 99, 105 (1977)).[8] In evaluating whether there is "no law to apply," the Court has focused on whether a given decision can be evaluated under a "judicially administrable standard of review." *Franklin*, 505 U.S. at 820 (Stevens, J., concurring).

In *Diaz-Covarrubias*, the Ninth Circuit applied *Heckler*'s holding to the question of administrative closure in the immigration context, the issue we confront here. That court concluded that the decision to grant or deny administrative closure is one "committed to agency discre-

---

[8] *Interstate Commerce Commission v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987), is one such case. The issue in *ICC v. Brotherhood* was whether a court had jurisdiction to review an agency's denial of a motion to reconsider, where the request to the agency was based on a claimed "material error," *id.* at 279, in its original opinion, i.e., that the case was wrongly decided on its original factual record. The Court held that the agency's decision to deny reconsideration was unreviewable. In reaching its conclusion, the Court noted that these types of decisions were traditionally thought unreviewable, whether made by courts or agencies, and that the APA was not intended to upset that tradition. The Court further noted, however, that it was "confirmed in that view by the impossibility of devising an adequate standard of review for such agency action." *Id.* at 282.

tion by law," 5 U.S.C. § 701(a)(2), and, therefore, unreviewable.[9] In arriving at this conclusion, the Ninth Circuit first noted that administrative closure is a procedural device mentioned neither in the Immigration and Nationality Act nor in the accompanying regulations, and that BIA precedent states only that administrative closure is

> an "administrative convenience," and "[a] case may not be administratively closed if opposed by either of the parties." This language does not provide any guidance to the BIA regarding when it should exercise its discretion to grant administrative closure. Indeed, it gives even less guidance than the BIA's statement that it could reopen proceedings sua sponte "in exceptional situations," which we found insufficient to allow review in *Ekimian*[ *v. INS*, 303 F.3d 1153, 1157 (9th Cir. 2002)]. Accordingly, we must conclude that "[b]ecause we cannot discover a sufficiently meaningful standard" for evaluating the BIA's decision not to close a case, we lack jurisdiction to

---

[9] The decision in *Diaz-Covarrubias v. Mukasey*, 551 F.3d 1114 (9th Cir. 2009), relied in significant part on an earlier Ninth Circuit decision, *Ekimian v. INS*, 303 F.3d 1153 (9th Cir. 2002), which held that the BIA's refusal to reopen proceedings *sua sponte* was unreviewable. *Sua sponte* reopening is permitted under the regulations, although the court found no judicially manageable standard for assessing the BIA's discretion on this matter. *Ekimian*, 303 F.3d at 1157. *Ekimian*, for its part, relied significantly on *Heckler v. Chaney*, 470 U.S. 821 (1985).

> review [the] claim that the BIA abused its dis-
> cretion in not doing so. *Id.* at 1159.

*Diaz-Covarrubias*, 551 F.3d at 1118 (citation omitted). The Eighth Circuit has agreed generally with the *Diaz-Covarrubias* analysis, *Hernandez v. Holder*, 606 F.3d 900, 904 (8th Cir. 2010), although, post-*Kucana*, it has clarified that the rule is not classified properly as jurisdictional. *Ochoa*, 604 F.3d at 549 ("When a plaintiff complains about an action that is committed to agency discretion by law, it does not mean that a court lacks subject matter jurisdiction over the claim. Instead, it means that there is no law to apply because the court has no meaningful standard against which to judge the agency's unfettered exercise of discretion."). Other circuits, without explicit consideration of the potential problems posed by the APA, have reviewed the agency's administrative closure determination under the abuse of discretion standard. *Cantu-Delgadillo v. Holder*, 584 F.3d 682, 686 (5th Cir. 2009); *Garza-Moreno*, 489 F.3d at 243.

We agree with the Eighth Circuit's conclusion that this issue is not termed properly one of jurisdiction: This is not a question of whether this court has the authority to review, but rather whether the lack of any "judicially manageable" standard, *Heckler*, 470 U.S. at 830, makes any review within our power, as a practical matter, impossible.

However, when we evaluate § 701(a)(2) as applied to administrative closure, in light of Supreme Court precedent from *Heckler* forward, we respectfully disagree with the Eighth and Ninth Circuits. As the Ninth

Circuit has noted, administrative closure is not a prac-
tice specified in the statute, nor is it mentioned in the
current regulations. It is a procedural device, not unlike
the myriad other procedural devices employed by quasi-
judicial bodies in administrative agencies and in the
Executive Office for Immigration Review in particular.
Like all of these devices, closure is one tool that assists
the person performing quasi-judicial duties in the
orderly management of the docket and the courtroom.[10]
We routinely have reviewed procedural rulings in immi-
gration and other administrative adjudications to deter-
mine whether an individual has received a full and fair
hearing before an agency.[11] In our appellate review of non-

---

[10] *Cf.* 8 U.S.C. § 1229a(a)(1) (vesting immigration judges with
the authority to "conduct proceedings" for deciding an alien's
inadmissibility or deportability); 8 C.F.R. § 1240.1(c) (imple-
menting regulations directing that the immigration judge
"shall receive and consider material and relevant evidence,
rule upon objections, and otherwise regulate the course of
the hearing").

[11] *See, e.g., Roadway Express, Inc. v. U.S. Dep't of Labor,* 495 F.3d
477, 484-85 (7th Cir. 2007) (reviewing an Administrative Law
Judge's imposition of sanctions for discovery violations);
*White v. U.S. Dep't of Hous. & Urban Dev.,* 475 F.3d 898, 907
(7th Cir. 2007) (evaluating the ALJ's denial of a motion to
amend a discrimination charge for abuse of discretion);
*Lakeland Enters. of Rhinelander, Inc. v. Chao,* 402 F.3d 739, 745
(7th Cir. 2005) (reviewing decision of ALJ not to admit certain
expert testimony for abuse of discretion in proceedings
before the Occupational Safety and Health Review Commis-
(continued...)

administrative cases arising in the district courts, we often evaluate the same kinds of procedural rulings.[12] We certainly have reviewed an IJ's refusal to grant a continuance, the procedural device most closely akin to the administrative closure sought to be reviewed here. *See Juarez v. Holder*, 599 F.3d 560, 564-65 (7th Cir. 2010); *accord Garza-Moreno*, 489 F.3d at 242 (holding, as a matter of Sixth Circuit law, that the reviewability of continuances was dispositive for the reviewability of administrative closure decisions); *Cantu-Delgadillo*, 584 F.3d at 687 n.8 (citing with approval *Garza-Moreno*).

Simply put, the decision to grant or deny administrative closure is cut of the same cloth as various other decisions that we review with regularity in both administrative and non-administrative arenas. The decision

---

[11] (...continued)

sion); *Podio v. INS*, 153 F.3d 506, 510 (7th Cir. 1998) (ruling that the IJ abused his discretion in failing to receive certain relevant testimony from proffered witnesses, and, because his decision was arbitrary, it denied the alien a right to a fair hearing).

[12] *See, e.g.*, *Hollins v. City of Milwaukee*, 574 F.3d 822, 828 (7th Cir. 2009) (reviewing evidentiary rulings for abuse of discretion); *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1026 (7th Cir. 2009) (reviewing a district court's ruling on discovery-related matters for abuse of discretion); *Schor v. City of Chicago*, 576 F.3d 775, 780 (7th Cir. 2009) (reviewing the denial of leave to amend a civil complaint for abuse of discretion); *United States v. Chiappetta*, 289 F.3d 995, 998-99 (7th Cir. 2002) (reviewing the denial of a continuance in a criminal trial for abuse of discretion).

to continue a matter without a specific date for its restoration to a trial docket simply is not the sort of decision that "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler*, 470 U.S. at 831. However, it *is* an area where an administrative tribunal's decision to proceed immediately or to defer decision can affect an individual's liberty and thus "infringe upon areas that courts often are called upon to protect." *Id.* at 832; *cf. Potdar v. Mukasey*, 550 F.3d 594, 596 (7th Cir. 2008) ("Congress did not intend to entitle illegal aliens to seek an adjustment of status upon the receipt of certificates from the state and federal labor departments and at the same time also intend[] section 1252(a)(2)(B)(ii) to place beyond judicial review decisions by the immigration authorities that nullif[y] the statute." (internal quotation marks and citation omitted) (alterations in original)). Such procedural questions are well within the competence of the courts to consider,[13] and the standard of

---

[13] We note that in *Zetino v. Holder*, ___ F.3d ___, 2010 WL 3385957, at *4 n.2 (9th Cir. Aug. 30, 2010), the Ninth Circuit, in an *amended opinion*, now has held that the decision of the BIA to reject a brief as untimely is subject to review in the court of appeals in light of *Kucana v. Holder*, 130 S. Ct. 827, 831 (2010). The court made no mention of the impact of *Zetino* on the continued viability of its holding in *Diaz-Covarrubias*. We have no occasion, of course, to decide whether the actual holding of *Zetino* with respect to the rejection of untimely briefs is correct.

review is of a character that is judicially administrable.[14] Such a decision by an administrative tribunal stands in stark contrast to the sort of review of agency action that troubled the Supreme Court in *Heckler*—an examination of whether the agency was required to institute an enforcement action in the first instance. Such a decision is akin to prosecutorial discretion; it is a policy matter typically outside the traditional review authority of the courts.

---

[14] The regulations provide a standard of "good cause" for the granting of continuances, *see* 8 C.F.R. § 1003.29, and the BIA has "defined the parameters of 'good cause'" as dependent "on the facts and circumstances presented." *Matter of Hashmi*, 24 I. & N. Dec. 785, 788 (BIA 2009). Recent Board decisions have given some content to the good cause standard in particularized circumstances. *Matter of Rajah*, 25 I. & N. Dec. 127 (BIA 2009) (listing factors to be considered when the alien seeks a continuance to await an employment-based administrative adjudication); *Hashmi*, 24 I. & N. Dec. at 790-94 (listing factors to be considered when the administrative procedure involves family-based relief). Administration of this standard creates no insuperable problem for a court habituated to reviewing judicial action under an abuse-of-discretion standard. Courts of appeals have been evaluating denials of continuances in immigration proceedings under the abuse of discretion standard for some time. *See, e.g.*, *Castaneda-Delgado v. INS*, 525 F.2d 1295, 1300 (7th Cir. 1975) ("While the question of whether or not to grant a continuance at such an administrative hearing ordinarily rests in the discretion of the officer conducting the hearing (in this case, the immigration judge), it is subject to reversal if there is a clear showing of abuse of that discretion.").

The Government's contention seems to be that the Supreme Court's decision in *Kucana* should have us rethink our position in *Cevilla v. Gonzales*, 446 F.3d 658, 660 (7th Cir. 2006). In *Cevilla*, we stated that the INA's restrictions supersede those of the APA on the matter of discretionary decisions. In *Kucana*, the Court merely stated that it "express[ed] no opinion on" the application of § 701(a)(2) to these issues. 130 S. Ct. at 839 n.18. That a footnote in *Kucana* simply pretermitted the possibility that the APA's narrow bar might have some effect does not convince us that our colleagues in the Fifth and Sixth Circuits were incorrect when they concluded, before *Kucana*, that the legality of the denial of administrative closure is a question within our authority to consider. Indeed, although the *Kucana* opinion expressly leaves open the question of the APA's application in immigration cases, a fair reading of our precedent already may have decided the matter in our circuit.

In sum, the decision to deny administrative closure, like the decision to deny a continuance, is within our cognizance. We apply ordinary judicial standards to determine whether the IJ abused his discretion in this case.

### 2.

We perceive no abuse of discretion in the IJ's decision to deny administrative closure. The record belies any assertion that Mr. Vahora properly made and maintained his request. *See* A.R. 108 (current counsel for Mr. Vahora informing the IJ that he "would have objected" to an attempt to join Mr. Vahora's case with his

parents' removal proceedings). Nor can we identify any other circumstances that would place the ruling outside the range of options from which a reasonable immigration judge would choose. Indeed, the Government opposed closure, and agreement of the parties is a prerequisite to closure under binding Board precedent. *See Matter of Gutierrez-Lopez*, 21 I. & N. Dec. 479 (BIA 1996). Nor can we say that the circumstances of Mr. Vahora's case were such that, in spite of Board precedent requiring agreement, the IJ unreasonably denied closure: Mr. Vahora had, as the IJ noted, no ground for immigration relief through his family. Although he sought closure on the basis of a *pending* application by his family, he produced only incomplete information about the status of the parents' case and, at least at the outset, appeared not to *know* the status definitively. Indeed, he represented that his parents' application for a change of status had been denied and was either on appeal or the subject of a pending motion to reopen. The success of these post-denial procedures being highly speculative, and with the Government unable or unwilling to initiate removal against his parents at the time of Mr. Vahora's first request for closure, the IJ's decision to proceed with the case on its own was not an abuse of discretion. We acknowledge the undesirability of pursuing removal proceedings alone against a minor whose parents are in the United States, but, under the circumstances of this case, the judge acted within the reasonable bounds of his discretion.[15]

---

[15] Furthermore, we note that the decision of the Attorney

(continued...)

## C.

Finally, Mr. Vahora contends that we must remand his case because the IJ failed to follow his duty, imposed by regulation, to inform Mr. Vahora of the possibility of other forms of immigration relief. 8 C.F.R. § 1240.11(a)(2) provides, in relevant part: "The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing, in accordance with the provisions of § 1240.8(d)." Mr. Vahora contends that the IJ failed to inform him that he could have been eligible for relief in the form of adjustment of status. We have considered an IJ's failure to fulfill this duty imposed by regulation under a due process analysis. *See Bejko v. Gonzales*, 468 F.3d 482, 487 (7th Cir. 2006).

Mr. Vahora's purported avenue for relief was that, *if* his father's request for change of status to an L-1 *non-immigrant* visa were approved, his father eventually may have obtained an *immigrant* visa on the same basis, which may have permitted him to apply for permanent residence with Mr. Vahora as a potential derivative on his application. This chain of events is simply too speculative to have given rise to a duty on the part of the IJ to explore it further with Mr. Vahora. As the Ninth Circuit has explained,

---

[15] (...continued)
General to commence proceedings against Mr. Vahora without joining his parents is unreviewable by statute. *See* 8 U.S.C. § 1252(g).

> The IJ was required to inform the alien of his or her *apparent* eligibility to apply for . . . relief. Yet [u]ntil the [alien] himself or some other person puts information before the judge that makes such eligibility "apparent," this duty does not come into play. We do not require IJs to speculate about the possibility of anticipated changes of circumstances and advise aliens of facts not suggested in the record.

*United States v. Moriel-Luna*, 585 F.3d 1191, 1197 (9th Cir. 2009) (emphasis in original) (internal quotation marks and citations omitted) (alterations in original). We do not suggest that the record must disclose that an alien has satisfied all of the prerequisites for alternative relief before an IJ's duty to inform him of potential eligibility for that particular form of relief arises. *See Moran-Enriquez v. INS*, 884 F.2d 420, 422-23 (9th Cir. 1989). A fair reading of this record, however, does not demonstrate that "an individual who is intimately familiar with the immigration laws" could have concluded that the record "raises a reasonable possibility that the petitioner may be eligible for relief." *United States v. Muro-Inclan*, 249 F.3d 1180, 1183 (9th Cir. 2001) (internal quotation marks omitted).

Moreover, Mr. Vahora cannot demonstrate prejudice. *See Bejko*, 468 F.3d at 487-88; *Feto v. Gonzales*, 433 F.3d 907, 912-13 (7th Cir. 2006). First, his attorney initially sought to have the case closed so that he could pursue the relief about which he claims the IJ was obligated to inform him. *See infra* I.B. Second, the entire chain leading

to a possibility of adjustment of status is dependent on an initial approved application for his father's change of status. Mr. Vahora initially informed the IJ that the application was denied—although the denial was on appeal or was the subject of a motion to reopen. In the remainder of his proceedings, Mr. Vahora never represented that his father's application for a change of status was successful. Indeed, the fact that his father found himself in removal proceedings suggests otherwise. Accordingly, we are not persuaded that § 1240.11(a)(2) requires us to remand this case for further proceedings.

## Conclusion

The Board's conclusions regarding Mr. Vahora's asylum eligibility are supported by substantial evidence; he has established neither that he was a victim of past persecution nor that he has a well-founded fear of future persecution on a country-wide basis. Further, Mr. Vahora has not established that the IJ abused his discretion in denying administrative closure. Nor did the IJ fail, in violation of a regulation, to inform Mr. Vahora about relief because the possibility of relief was highly speculative on the record. For those reasons, we deny the petition for review.

PETITION DENIED